*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2015 UT 93**

IN THE

**SUPREME COURT OF THE STATE OF UTAH**

———————————

DIRECTV and DISH NETWORK
*Appellants*,

*v.*

UTAH STATE TAX COMMISSION
*Appellee*.

———————————

No. 20130742
Filed December 14, 2015

———————————

On Direct Appeal

———————————

Fourth District, Utah County
The Honorable Samuel D. McVey
No. 110402039

———————————

Attorneys:

Michael L. Larsen, Cory D. Sinclair, Salt Lake City,
E. Joshua Rosenkranz, Jeremy N. Kudon, Nicholas G. Green,
New York City,
Eric A. Shumsky, Washington D.C.,
for appellants

Sean D. Reyes, Att'y Gen., Bridget K. Romano, Solicitor Gen.,
Michelle A. Alig, Laron J. Lind, Asst. Att'ys Gen., Salt Lake City,
for appellee

———————————

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, and
JUSTICE HIMONAS joined.

———————————

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    In this case we consider a constitutional challenge to Utah's pay-TV sales tax scheme. The scheme provides a sales tax credit for "an amount equal to 50%" of the franchise fees paid by pay-TV providers to local municipalities for use of their public rights-of-way. Not all pay-TV providers pay franchise fees, however. Cable providers employ a business model that triggers franchise fees (and, by extension, the tax credit); satellite providers use a different model that triggers no such fees (or credit). The satellite providers filed suit, asserting that Utah's tax scheme unconstitutionally favors local economic interests at the expense of interstate commerce. In this challenge, the satellite providers assert claims under the dormant Commerce Clause of the U.S. Constitution and the Uniform Operation of Laws Clause of the Utah Constitution.

¶2    The district court dismissed these claims on a motion for judgment on the pleadings. We affirm. We hold that Utah's pay-TV tax credit survives dormant commerce scrutiny because it does not discriminate in favor of a business or activity with a distinct geographic connection to Utah. We also hold that the tax credit survives rational basis scrutiny under the Uniform Operation of Laws Clause.

## I. BACKGROUND

¶3    Pay-TV programming is delivered in one of two main ways—by cable or satellite.[1] Cable providers employ a network of wires run underground or on utility poles. The programming content is assembled at "headend" facilities, of which there are several in Utah, from which it is sent through a network of underground or overhead cables. Subscribers access the transmitted programming through a cable "drop" line that runs to their homes.

¶4    The infrastructure necessary to deliver cable programming to Utah subscribers requires substantial investment in the local economy. Cable providers invest millions of dollars in Utah and

---

[1] The facts presented here are taken from the plaintiffs' amended complaint. We accept them as true given the procedural posture of the case (review of a motion for judgment on the pleadings).

employ over one-thousand Utahns. They build and staff headend facilities, pay property taxes, and install vast networks of cables. And to install cable networks, cable providers invest significant capital in the labor required for installation and in "franchise fees" for using public rights-of-way. Municipalities derive significant revenue from these fees—about $17 million annually in Utah—which helps fund local governments.

¶5    Satellite providers avoid many of these infrastructure costs by delivering TV programming directly to subscribers. Under the satellite TV business model, satellite providers shoulder a different set of expenses—those associated with building, launching, and maintaining orbital satellites. There is a tradeoff for the astronomical costs associated with satellites: The investment in satellites allows the satellite providers to avoid the infrastructure costs that burden their cable competitors. Once the orbital satellite is in operation, the providers assemble programming content at various "uplink" centers across the country (of which there are none in Utah). And once the programming package is assembled, it is transmitted to the satellites, which then transmit it directly to subscribers' homes. Subscribers access the programming through a small satellite dish installed on the exterior of their home, which receives and processes the content. Thus, satellite providers do not lay a single foot of local cable. They accordingly avoid the costs associated with building and operating headends and installing and maintaining cables. Their only local connection is to pay independent contractors to install and maintain satellites on people's homes.

¶6    Satellite providers also avoid the payment of local franchise fees. To the extent franchise fees are seen as a payment for the right of way for running cable, the exemption from franchise fees is a natural outgrowth of the business model. But the exemption from local franchise fees is also assured by federal law. Under the Telecommunications Act of 1996, satellite providers are exempted from "the collection or remittance, or both, of any tax or fee imposed by any local taxing jurisdiction," such as a city or county, but not the state. Telecommunications Act of 1996, Pub. L. No. 104-104 § 602(a), 110 Stat. 56.

¶7    Both satellite and cable subscribers are subject to an excise sales tax in Utah. In 2004 the legislature enacted a 6.25 percent excise sales tax for all pay-TV service. UTAH CODE § 59-26-103. Then, in 2008, the legislature adopted a tax credit for up to 50 percent of the franchise fees paid by pay-TV providers to "counties and municipalities within the state." *Id.* § 59-26-104.5(2)(b). In so doing, the legislature also required service providers to pass the value of this tax credit through to its customers, resulting in lower subscription costs. *Id.* § 59-26-104.5(4)(a). Because satellite providers pay no local franchise fees, they are ineligible for this tax credit. Thus, while both cable and satellite subscribers pay the same excise sales tax, cable providers alone pay franchise fees and thus qualify for the tax credit.  So only cable subscribers get the benefit of the tax credit's "pass through" requirement.

¶8    Two satellite providers, DIRECTV and DISH Network, challenged this tax credit. Their complaint alleged that the credit runs afoul of the Commerce Clause and Equal Protection Clause of the U.S. Constitution and the Uniform Operation of Laws Clause of the Utah Constitution. Specifically, the satellite providers alleged that the tax credit violates the dormant Commerce Clause by facially granting a preference based on geographic ties to the site, imposing a discriminatory effect on interstate commerce, and being motivated by an intent to discriminate against satellite providers who do not have an extensive local footprint. And they averred that the tax credit violates the Equal Protection Clause of the U.S. Constitution and the Uniform Operation of Laws Clause of the Utah Constitution because it advances no valid state interest.

¶9    The parties conducted initial discovery for several months. Then, one month before the discovery cut-off, the State Tax Commission moved for judgment on the pleadings.

¶10  The district court granted that motion. First, it held that the franchise fee tax credit did not run afoul of the dormant Commerce Clause because it was not facially discriminatory, discriminatory in effect, or discriminatory in purpose. In the district court's view, there was no discrimination of any consequence because the differential treatment of satellite providers was on the basis of a "technological mode of operation" and not the location

of a business activity. Further, the district court concluded that the credit did not violate either the Equal Protection Clause or the Uniform Operation of Laws Clause because cable and satellite providers are not similarly situated and the different tax treatment is justified by legitimate state interests in "tax parity" and in "[b]ringing business to the state."

¶11 The satellite providers filed this appeal. In reviewing a decision on a motion for judgment on the pleadings, we yield no deference to the district court's analysis. We consider the legal viability of the satellite providers' claims de novo. *See State v. Ririe*, 2015 UT 37, ¶ 5, 345 P.3d 1261. We also accept the factual allegations of the complaint as true.

¶12 Two sets of questions are presented. First, we consider the satellite providers' dormant Commerce Clause claims. We affirm the dismissal of these claims on the ground that the franchise fee tax credit does not discriminate in a manner triggering strict scrutiny under the dormant Commerce Clause. Second, we also affirm the dismissal of the Uniform Operation of Laws Clause claims.[2] Here we find rational grounds for the differential treatment of satellite and cable providers, and thus hold that the satellite providers have failed to state a viable claim.

## II. THE DORMANT COMMERCE CLAUSE

¶13 The Commerce Clause grants Congress the authority to regulate interstate commerce. U.S. CONST. art. I, § 8, cl. 3. By negative implication, this provision also limits the states' authority in this realm. *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015); *see also Union Pac. R.R. Co. v. Auditing Div. of the Utah State Tax Comm'n*, 842 P.2d 876, 883 (Utah 1992) (noting that a state "cannot impose a tax which discriminates against interstate commerce"). So even if Congress has not spoken on an issue of interstate commerce, states are prevented from encroaching on Congress's authority—hence the term "dormant" or "negative" Commerce Clause.

---

[2] The satellite providers abandoned their equal protection claim on appeal. They are defending only their dormant commerce and uniform operation of laws claims.

¶14 The U.S. Supreme Court has articulated two levels of dormant Commerce Clause scrutiny. First is a "strict" level of scrutiny triggered by laws that directly discriminate against interstate commerce—by "facial" discrimination or discrimination that is apparent in its effect and discriminatory purpose. *Or. Waste Sys. Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); *see also Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) (establishing that "facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives"). Discrimination of this sort is "virtually *per se* invalid." *Or. Waste Sys.*, 511 U.S. at 99. A law subject to strict scrutiny survives only if it serves a "legitimate local purpose" that "could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 139 (1986) (citation omitted). This is a high bar that is seldom met. Only on rare occasions has the high court upheld discriminatory laws against a strict scrutiny challenge. *See id.* at 151–52 (upholding Maine's ban on the importation of live baitfish in order to protect fisheries because this purpose "could not adequately be served by available nondiscriminatory alternatives").

¶15 There is a second form of dormant commerce scrutiny. A law whose effect on interstate commerce is merely "incidental" triggers a balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *Pike* balancing invalidates state laws affecting interstate commerce only if the law's burdens on commerce outweigh its "putative local benefits." *Id*. The *Pike* bar is relatively low. If the law's effect on interstate commerce is merely incidental, it has a much greater chance of surviving constitutional scrutiny.

¶16 The satellite providers are not advancing a *Pike* claim. (They did initially, but they have abandoned it on appeal.) Instead they contend that the tax credit is directly discriminatory and fails strict scrutiny. Specifically, they allege that the tax credit discriminates on its face, in effect, and in purpose.

¶17 The satellite providers claim that the discrimination in question "is discernible from the face of the relevant Utah statutes." In their complaint they allege that Utah Code section 59-26-104.5 makes clear on its face that the tax credit is available only

"to those multichannel video service providers that perform a specific economic activity in the State—i.e., the use of the State's public rights-of-way to deliver multichannel video service to Utah households." The satellite providers also elaborate on this point on appeal. They contend that the preference for "local economic activity" is evident in the express terms of the statute since the availability of the credit is dependent on the payment of franchise fees "within the state." And in the satellite providers' view that makes the tax credit facially discriminatory under the dormant Commerce Clause.

¶18 The allegations of discriminatory effect speak to the varying impact of the tax credit on two means of delivering pay-TV programming. Here the satellite providers allege that "[t]he tax credit differentiates between two types of businesses on the basis of whether a provider conducts a specific economic activity in the State"—specifically, "using ground distribution equipment in the State's public rights-of-way to deliver programming signals to subscribers" instead of delivering the same programming signals via satellite. Because the cable business model involves a "local footprint" that is larger than that of the satellite model, the satellite providers allege a discriminatory effect that runs afoul of the dormant Commerce Clause. They claim a discriminatory effect in the tax credit's impact of "shift[ing] the competitive balance in the pay-TV market in a way that benefits local economic interests at the expense of non-local interests."

¶19 The satellite providers also allege discriminatory purpose. They assert that "[t]he cable industry drafted the original tax credit proposal and urged the State of Utah to distinguish between cable and satellite TV on the basis that cable provides substantially more economic benefits to the State and its residents than satellite TV." And because "[t]he Utah Legislature adopted and enacted the bill without making any material changes to the draft language proposed by the local cable industry," the satellite providers contend that "the Utah Legislature adopted, as its own, the discriminatory purpose of the statute."

¶20 Each of these theories of discrimination is distinctly pled. And each, at some level, implicates distinct lines of analysis in controlling precedents. Yet each theory also triggers a common

threshold question—whether the basis of the alleged discrimination is one that implicates strict scrutiny under the dormant Commerce Clause.

¶21 We decide this case at this threshold level.[3] We affirm on the ground that the satellite providers have failed to identify an element of discrimination in the sales tax credit (on its face, in effect, or in purpose) that triggers strict scrutiny under the line of dormant commerce cases at issue. First, we present the governing framework for analysis under the applicable decisions from the U.S. Supreme Court—explaining that the dormant Commerce Clause tolerates discrimination based upon differential treatment of two different business models, and condemns only discrimination based on the location of a business or regulated business activity. Second, we consider—and reject—the dicta identified by the satellite providers as sustaining their claims (in particular, *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980)). Third, we apply the governing caselaw to the claims pled here—concluding that the Utah tax credit is not impermissibly discriminatory because it is based not on a distinct geographic connection of a business or business activity, but only on differences in two competing business models. And we conclude with some observations about the current state of the law under the dormant Commerce Clause.

*A. Controlling U.S. Supreme Court Precedent*

¶22 The dormant Commerce Clause "precludes States from 'discriminat[ing] between transactions on the basis of *some interstate element.*'" *Comptroller of Treasury of Md.*, 135 S. Ct. 1787 at 1794 (2015) (emphasis added) (quoting *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332, n.12 (1977)). "This means, among other things, that a State 'may not tax a transaction or incident more

---

[3] *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125 (1978) (concluding, without analyzing the questions of facial discrimination or discrimination as to effect or purpose, that "[p]lainly, the [] statute does not discriminate against interstate goods, nor does it favor local [businesses or interests]" and thus "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce").

heavily when it crosses state lines than when it occurs entirely within the State.'" *Id.* (quoting *Armco Inc. v. Hardesty*, 467 U.S. 638, 642 (1984)). "'Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage *to local business*, or by subjecting interstate commerce to the burden of 'multiple taxation.'" *Id.* (emphasis added) (quoting *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959)).

¶23 The key question presented concerns the threshold matter of defining *interstate commerce*—of identifying the "interstate element" on which discrimination is prohibited, or in other words, the grounds on which a business is counted as a "local" one that may not be favored. *Id.* (citation omitted). Thus, it has long been held that the dormant Commerce Clause prohibits the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. But that prohibition implicates a threshold definitional question—of the scope of the "in-state" and "out-of-state interests" that are protected from discrimination.

¶24 To date, the Supreme Court has identified "in-state" and "out-of-state" businesses on the basis of a distinct *geographic* connection (or lack thereof) to the home state. Thus, the cases in which the Court has invoked strict dormant commerce scrutiny have involved favoritism for entities or business operations *within* a particular state—and attendant discrimination against entities or business operations *outside* such state. And the court has emphasized that the dormant Commerce Clause is not implicated by mere discrimination based on "differences between the nature of [two] businesses," and not on the "location of their activities." *Amerada Hess Corp. v. Dir., Div. of Taxation*, 490 U.S. 66, 78 (1989).

¶25 A classic case triggering strict dormant commerce scrutiny involves discrimination based on a business entity's *principal place of business. See Lewis,* 447 U.S at 42 (striking down a Florida statute prohibiting banks "with principal operations *outside* Florida" from operating investment subsidiaries or giving investment advice within the state). The physical location of a business's "principal operations" is a clear indication that the business is an "in-state" or "local" interest for dormant commerce purposes. *Id.* (citation

omitted). And discrimination on that basis will certainly trigger strict scrutiny.

¶26 Strict scrutiny is also triggered by laws that discriminate based on the location of a regulated business *activity*.[4] Again the focus is on geographic location.[5] "No one disputes that a State may enact laws pursuant to its police powers that have the purpose and effect of encouraging domestic industry." *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 271 (1984). But "the Commerce Clause stands as a limitation on the means by which a State can constitutionally seek to achieve that goal." *Id.* And a traditional application of that limitation involves discrimination rooted in the geographic location of a particular business activity. "Thus, the Commerce Clause limits the manner in which States may legitimately compete for interstate trade, for 'in the process of competition no State may discriminatorily tax the products manufactured

---

[4] *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 331 (1977) (invalidating New York's "transfer tax," which imposed a lower rate on stock purchased through the New York Stock Exchange and a higher rate for stock purchased on out-of-state exchange); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) (holding unconstitutional an ordinance prohibiting the sale of milk not bottled within five miles of the city and explaining that such a measure erected "an economic barrier protecting a major local industry against competition *from without the state*" (emphasis added)).

[5] The satellite providers point to *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 268, 270 (1984), to buttress their approach. But this case offers little support for their "relative footprint" theory. *Bacchus* involved a tax exemption under Hawaiian law for two types of alcoholic beverages: okolehao brandy, distilled from a shrub "indigenous" and "peculiar" to Hawaii; and fruit wine "manufactured in the State from products grown in the State." *Id.* at 270 (citation omitted). So the exemptions at issue were limited to products with a distinct geographic connection to Hawaii. Nothing in *Bacchus* suggests that a tax exemption for all fruit wine, whether produced in or out of the state, would implicate the dormant Commerce Clause just because it might yield an advantage to manufacturers leaving a larger "footprint" on the Hawaiian economy.

or the business operations performed *in* any other State.'" *Id.* at 272 (emphasis added) (quoting *Boston Stock Exch.*, 429 U.S. at 337).[6]

¶27 A related principle has been invoked in cases involving local laws rewarding the extent of business activity *within* the home state. *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388 (1984), for example, involved a New York tax provision that afforded a corporate tax credit proportional to the ratio of goods that a company exported *from the state*. The effect of this provision was to increase tax credits as the company moved more of its shipping activities into the state, and decrease tax credits as it shifted more of its activities out of the state. *Id.* at 401. Because the state employed discriminatory taxes "in an attempt to induce 'business operations to be performed *in the home State* that could more efficiently be performed elsewhere,'" the court found the tax scheme unconstitutional. *Id.* at 406 (emphasis added) (quoting *Bos. Stock Exch.*, 429 U.S. at 336)). Such a law discriminates in a manner triggering strict dormant commerce scrutiny because it exerts "an inexorable hydraulic pressure on interstate businesses to ply their trade *within the State that enacted the measure*." *Am. Trucking Assocs., Inc. v. Scheiner*, 483 U.S. 266, 286 (1987) (emphasis added); *see also Armco*

---

[6] This same principle has been applied in other cases striking down protectionist measures that discriminate on the basis of geographic location. *See, e.g., C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 391 (1994) (law restricting the right to process waste to a particular in-state processor); *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 275–77 (1988) (providing tax credits for local ethanol producers and to those from states that granted the state a reciprocal tax credit); *Nippert v. City of Richmond*, 327 U.S. 416, 430–31 (1946) (law subjecting out-of-state solicitors to fees from multiple jurisdictions while leaving local solicitors subject only to a single levy); *Walling v. Michigan*, 116 U.S. 446, 455 (1886) (law imposing a tax on the sale of alcoholic beverages produced outside the State); *Welton v. Missouri*, 91 U.S. 275, 277 (1875) (Missouri statute that "discriminat[ed] in favor of goods, wares, and merchandise which are the growth, product, or manufacture of the State, and against those which are the growth, product, or manufacture of other states or countries").

*Inc. v. Hardesty*, 467 U.S. 638, 642 (1984) (striking down differential tax scheme favoring in-state businesses and explaining that "a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State").[7]

¶28 In all of the above cases, the focus has been on the geographic location of a business or business activity. Where strict dormant commerce scrutiny is invoked, it is as a result of discrimination on such basis. The Court has never held that the dormant Commerce Clause is concerned with discrimination based on the relative local "footprint" associated with a particular business activity.

¶29 In fact, the Court has undermined that view in a line of cases affirming the prerogative of state and local governments to treat different business models differently. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981); *Amerada Hess*, 490 U.S.at 66. Under these cases, a state may treat "two categories of companies" differently so long as the discrimination is based on "differences between the nature of their business" and not "the location of their activities." *Amerada Hess*, 490 U.S. at 78. That sort of discrimination does not appear to implicate dormant commerce strict scrutiny under existing caselaw.

---

[7] As the satellite providers note, the Supreme Court has not expressly framed its dormant commerce test in terms requiring a distinct geographic connection to the home state. Yet the court's precedents typically have involved laws rewarding activity that is distinctly in-state, or penalizing activity that is distinctly out-of-state. A good example is *Armco Inc. v. Hardesty*, 467 U.S. 638 (1984). The Court in that case struck down a West Virginia law exempting local manufacturers from a gross receipts tax. *Id.* at 641–42. And manufacturing is either distinctly in-state or out-of-state, so a tax scheme exempting local manufacturing is a law favoring a distinctly in-state activity. *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 399–400 (1984), is similar. A corporate tax credit proportional to the ratio of goods that a company exports from the state is a law favoring distinctly in-state activity; exporting activity (for any given good), after all, can originate from only one state.

¶30  *Exxon* involved a Maryland statute prohibiting oil producers from operating retail gas stations within the state, or in other words, restricting retail operations to those who did not also produce their own petroleum. 437 U.S. at 128. In *Exxon* the law's burden fell entirely on out-of-state oil companies, as there were no local petroleum producers in Maryland. And producers were thus forced to choose either dramatically transforming their business model or leaving Maryland's retail market altogether. The producers claimed that the law would "surely change the market structure by weakening [producers]." *Id.* at 127 (citation omitted). And the burden on these out-of-state producers appeared to work a potential windfall for local retailers, who made up ninety percent of Maryland's existing retail market. By pushing these out-of-state producers out of the retail market, Maryland's law created new market vacancies for these local retailers to fill. For these reasons, the producers claimed that this law violated the dormant Commerce Clause. *Id.*

¶31  Yet the Court disagreed. *Id.* at 126. The fact that the law could potentially work a windfall for local retailers was beside the point in the Court's view because the law did not foreordain such an effect. The law "create[d] no barriers whatsoever" for out-of-state retailers. *Id*. And such retailers were free to fill the vacancies left by the producers. *Id.* More importantly for present purposes, the Court rejected the producers' assertion that interstate commerce is burdened when one kind of interstate company (producers) is weakened. "[I]nterstate commerce," the Court reasoned, "is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* at 127. Put another way, laws that merely alter the market *share* among interstate companies do not implicate the dormant Commerce Clause. *Id.* at 126–27.

¶32  The *Clover Leaf Creamery* case is similar. That case involved a Minnesota law prohibiting the sale of dairy products in non-reusable packaging. Because the law was not "simple economic protectionism," but instead "regulat[ed] evenhandedly," the Court found no dormant Commerce Clause concerns. *Clover Leaf Creamery*, 449 U.S. at 471 (citation omitted). The Court conceded that the Minnesota pulpwood industry would be the beneficiary

(at the expense of out-of-state plastic companies). *Id.* at 473. But it found that at most the law would shift business from one type of manufacturer to another and that there was "no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms." *Id.*

¶33 The Court emphasized similar principles in *Amerada Hess*. The New Jersey statute at issue in that case taxed a portion of interstate companies' "entire net income" based on the amount of business conducted in the state. 490 U.S. at 70. Producers' "entire net income" turned out to be larger than retailers' because producers paid a "windfall profit tax" to the federal government based on its petroleum production, and this tax factored into the "entire net income" calculation. *Id.* at 78. After New Jersey denied the producers' attempt to deduct the tax, the producers sought relief in the Supreme Court, asserting that the law burdened interstate commerce by favoring interstate retailers over interstate producers. Relying on its prior holding in *Exxon*, the Court rejected this argument. It noted the interstate character of these two "categories of companies" (producers and retailers) and concluded that "whatever disadvantage this deduction denial might impose on [producers] does not constitute discrimination against interstate commerce." *Id.* at 78. Specifically, the Court held that "[w]hatever different effect the . . . provision may have . . . results solely from differences between the nature of their businesses, not from the location of their activities." *Id.*[8]

¶34 Thus, the dormant Commerce Clause's strict prohibition on discrimination is implicated by laws treating different interests

---

[8] The satellite companies seek to limit the above cases. They insist that in *Exxon* and *Amerada Hess* the Court concluded only that the laws in question were not protectionist. We read the cases differently. The likely impact of the law in *Exxon* was to yield a competitive advantage to local retail gas companies, just as the law in *Clover Leaf Creamery* favored local pulpwood procedures that were already creating compatible packaging. Yet the Court in these cases found no dormant commerce problem because the laws in question did not yield an advantage *based on a distinct geographic connection* to the home state.

differently *because* one set of interests has a distinct geographic connection to the home state and others lack it. The high Court has never deemed strict dormant commerce scrutiny to be triggered by a law favoring a business model with an economic "footprint" that is somewhat larger than a competing business model. And in fact its cases seem to repudiate that approach; they do so at least implicitly by carving out room for laws that discriminate based on differences in the nature of business operations and not from the location of the business.

### B. The Footnote in Lewis

¶35 A key element of the satellite companies' response to the above is a footnote in *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980). There the Court states that "discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism we have identified." *Id*. The satellite companies say that means that discrimination based on differences in the relative economic footprint of competing business models is sufficient to trigger dormant commerce strict scrutiny. We see the matter differently. As noted above, the *Lewis* Court's analysis hinged on the determination that the Florida law in question discriminated on the basis of the location of a business entity's "principal operations." *Id*. at 42. It concluded that the law discriminated among "affected business entities according to the extent of their contacts with the local economy," but in context the point was not about a relative differential in the size of a business model's economic footprint; it was that the law prohibited "only banks, bank holding companies, and trust companies with principal operations *outside* Florida . . . from operating investment subsidiaries or giving investment advice within the State." *Id*.

¶36 We do not read the *Lewis* footnote's reference to "discrimination based on the extent of local operations" as a freewheeling expansion of the domain of strict dormant commerce scrutiny. In context, the "local operations" referred to must be a business entity's "principal operations." That, in fact, is the entire thrust of the footnote. It is rejecting the argument that the Florida law's prohibition could conceivably "also apply to locally organized bank holding companies"—"if they maintained their principal operations outside the State." *Id*. at 42, n.9. In rejecting that point, the

*Lewis* court offers two rejoinders: (a) that it is "unlikely" under federal banking law that a banking company organized under Florida law would have its principal operations elsewhere; and (b) that "[i]n any event, discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism *we have identified*." *Id.* (emphasis added).

¶37 The satellite providers' expansive reading of the *Lewis* footnote is untenable in light of the above. The only "local operations" the Court "identified" in *Lewis* were a business's *principal* operations. So the quoted dictum in the *Lewis* footnote is not an endorsement of the satellite companies' "relative economic footprint" theory of dormant commerce. (There is nothing *relative* about a business entity's *principal* place of business—which is by definition a distinctive geographic connection.[9]) It is simply a reinforcement of the *Lewis* Court's core point that discrimination based on a business's principal place of business is classic geographic protectionism prohibited by the dormant Commerce Clause. At most, the *Lewis* footnote establishes that discrimination based on a business's principal place of business may still be actionable even if it cuts against businesses organized under the home state's laws. That is hardly an indication of the Supreme Court's extension of strict dormant commerce scrutiny to encompass discrimination based on different business models with differing impacts on the local economy.

### C. The Satellite Providers' Claims

¶38 The satellite providers' have failed to state a claim under the dormant Commerce Clause.[10] The Utah sales tax credit "does not discriminate against interstate goods, nor does it favor local [businesses or interests]. . . . [and hence] does not lead, either logically or as a practical matter, to a conclusion that the State is dis-

---

[9] *See* BLACK'S LAW DICTIONARY 1384 (10th ed. 2014) (defining *principal* as "[c]hief; primary; most important").

[10] Our dormant commerce analysis begins and ends with our consideration and application of the strict scrutiny line of cases. We do not assess the viability of the pay-TV tax scheme under the *Pike* balancing test because the plaintiffs have abandoned that claim on this appeal.

criminating against interstate commerce." *Exxon*, 437 U.S. at 125. Specifically, the tax credit does not discriminate in favor of companies or activities with a unique geographic connection to the state of Utah. Cable companies may have more employees and infrastructure in the state than their satellite competitors. But their larger economic footprint does not make them "in-state" businesses under the dormant Commerce Clause. Nor are satellite companies "out-of-state" businesses in the sense in which that phrase is used in the caselaw. We therefore dispose of this case at this threshold level without delving into more detailed analysis of the satellite providers' theories of dormant commerce discrimination (facial discrimination, or discrimination in effect and purpose). *See id.* at 125–28 (resolving the case on such a threshold basis).[11]

¶39 The cable companies have no distinct geographic connection to the state of Utah. Their principal place of business is elsewhere. The same goes for the satellite providers. And the business activity of both classes of pay-TV providers—delivery of television programming to Utah households—is equally "in-state." The difference between cable and satellite is not that one is located or primarily operates "in-state" and the other "out-of-state"; it is that they employ different business models that have a different impact on local economies. But that does not trigger strict dormant commerce scrutiny. *See Amerada Hess*, 490 U.S. at 78 (dormant commerce scrutiny not implicated where the "different effect" that a law may have "results solely from differences between the nature of [competing] businesses, not from the location of their activities").

¶40 The franchise fee sales tax credit may marginally "change the market structure" of the pay-TV market in Utah "by weakening" the satellite providers relative to their cable competitors. *See*

---

[11] The satellite providers argue that dismissal of a dormant Commerce Clause challenge on the pleadings is improper because such claims require a fact intensive, case-by-case determination. Because we conclude that the Utah sales tax scheme does not discriminate against interstate commerce as a matter of law, however, we conclude that dismissal on the pleadings is proper.

*Exxon*, 437 U.S. at 127. And, at the margins, that may cause "some business to shift from one interstate supplier to another." *Id*. But that is insufficient to trigger strict dormant commerce scrutiny. *Id*.[12]

¶41 The tax credit provides no benefits to business entities based in Utah at the expense of those that are not.[13] All cable

---

[12] *See, e.g.*, *Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 385 (1991) ("It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing State."); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988) ("The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description *in connection with the State's regulation of interstate commerce*.").

[13] In this respect, *Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996), is distinguishable. The satellite providers cite *Fulton* in support of their position that Utah's tax credit impermissibly encourages the purchase of pay-TV packages with a local connection. They claim that Utah's law is "materially indistinguishable" from the one struck down in *Fulton*. We disagree. We read *Fulton* as entirely consistent with our view.

In *Fulton* the Court struck down a North Carolina tax law allowing state residents to take a tax deduction on the value of corporate stock to the extent of the percentage of the issuing corporation's "sales, payroll, and property *located in the State*." *Id*. at 328 (emphasis added). Under this scheme, the tax on stock of a company doing all of its business in North Carolina would be zero, while the tax on the stock of a company doing none of its business in North Carolina would be one-hundred percent of the stated rate. *Id*. But the connection to the home state under this law was based on a distinct geographic connection—sales, payroll, and property "located in the State." *Id*. So the problem with the tax deduction in *Fulton* was not its encouragement of investment in corporate entities with a relatively larger North Carolina "footprint"; it was its discrimination against "out-of-state" entities and in favor of "in-state" entities as measured by their distinct geographic connection to the state (or lack thereof). Our Utah sales tax law does no such thing. It discriminates not on the basis of geographic connection but a difference in business models.

companies (whether based in Utah or elsewhere) are entitled to the tax credit; and all satellite companies (including any that might choose to base their operations in Utah) are not. Thus, Utah law does not make in-state businesses "gainers" or out-of-state businesses "losers." *Clover Leaf Creamery*, 449 U.S. at 473.[14] It discriminates solely on the basis of a difference in business models. After all, the Utah statute does not incentivize or punish a business for its distinct geographic ties to the state. It is triggered only by a company's self-chosen business model. Utah's law, in other words, doesn't dictate or influence where and how the satellite providers operate their business; it leaves that decision up to them and imposes a tax consequence not based on location but on the choice of business model. And that "fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce." *Exxon*, 437 U.S. at 126.[15]

---

[14] This distinguishes the law here from that in *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977). The satellite providers analogize the Utah tax credit to the prohibition on Washington apple growers' use of their established grading system held unconstitutional in that case. But the analogy is inapt. The legislation at issue in *Hunt* sought to shelter apple growers with a specific connection to the home state (North Carolina). The Utah tax credit does no such thing. It does not pick winners and losers based on a distinct geographic connection to the home state.

[15] The satellite providers insist that Supreme Court precedent forbids a state from awarding a benefit based "on whether someone builds a building, uses a facility, or engages in activity within the state." But the Supreme Court has never so held. It *has* concluded that a law *forbidding* in-state commercial activity *without a brick-and-mortar presence* would raise dormant Commerce Clause concerns. *Granholm v. Heald*, 544 U.S. 460, 466 (2005) (striking down a New York law prohibiting direct-to-consumer wine sales unless the winery first established a distribution operation within the state). Yet the Utah sales tax scheme does nothing of the sort. It may *incentivize (at the margins)* the construction of "brick-and-mortar" type operations in Utah (specifically, more cable). But that in itself does not trigger strict dormant commerce scrutiny. And Utah law, in fact, does not award benefits (a tax credit) *based*

¶42 Our analysis is in line with that of many other courts who have upheld similar tax provisions against dormant commerce challenges.[16] A few courts have reached contrary conclusions.[17]

---

*on* the construction of a building, use of a facility, or performance of an activity. A satellite provider could build all the buildings and use all the facilities in the world (or, more properly, the state), but it would not qualify for the tax credit if it didn't pay franchise fees. And that says that the benefit afforded to cable companies is not based on their construction of facilities but on their payment of franchise fees. Because those fees, moreover, are linked to a business model (and, in turn, a greater economic footprint) and not physical presence or activity in the state, the principle invoked by the satellite companies is not implicated.

[16] *See DIRECTV, Inc. v. Treesh*, 469 F. Supp. 2d 425, 437–38 (E.D. Ky. 2006) (upholding Kentucky's uniform tax for pay-TV services and prohibition on local franchise fees because cable companies are "no more a 'resident,' 'local,' or 'in-state' business than" satellite providers, and any disparate treatment was "owed not to the geographic location of the companies, but to their different delivery mechanisms"), *aff'd* 487 F.3d 471, 480 (6th Cir. 2007) (concluding that the tax did not implicate the dormant Commerce Clause because it did not "'divert market share' from an out-of-state good to an identical in-state good" (citation omitted)); *DIRECTV, Inc. v. Commonwealth*, Civ. No. 10-0324-BLS1, 2012 WL 6062737, at *11 (Mass. Super. Nov. 26, 2012) (upholding a Massachusetts excise tax on satellite subscribers but not cable subscribers, and concluding that "satellite TV and cable TV are not similarly situated for Commerce Clause purposes, and that the satellite tax does not discriminate against the satellite providers based on geography"), *aff'd DIRECTV, LLC v. Dep't of Revenue*, 25 N.E.3d 258, 266–68 (Mass. 2015) (assuming that cable companies are in-state interests, but still concluding that the "differences in the manners in which the cable and satellite companies are treated do not amount to actionable discrimination if they do not impose a greater burden on the satellite companies"); *DIRECTV, Inc. v. State*, 632 S.E.2d 543, 550 (N.C. Ct. App. 2006) (concluding that North Carolina's five percent sales tax imposed only on satellite companies did not violate the dormant Commerce Clause because the tax "depends only upon how companies deliver television programming services to

We simply disagree with their analysis as we do not think that a cable TV operation can be said to be an "in-state interest" under the governing caselaw.

¶43 We affirm the dismissal of the satellite companies' dormant commerce claims on this basis. The satellite providers have not alleged discrimination based on a relevant "interstate element" under the governing cases. *Wynne*, 135 S. Ct. at 1794 (quoting *Bos. Stock Exch.*, 429 U.S. at 332 n.12). And absent any such allegation, the satellite providers' claims fail as a matter of law. All of their dormant commerce allegations—as to facial discrimination or discrimination in effect and purpose—are along the same lines. All are directed at the tax credit's differential impact on different business models. And because we find such discrimination to fall beyond the purview of the dormant Commerce Clause, we affirm the district court's decision granting the Tax Commission's motion for judgment on the pleadings.

D. Conclusion on Dormant Commerce

---

its subscribers, and not whether the delivery of the programming services occurs inside or outside the state."); *DIRECTV, Inc. v. Levin*, 907 N.E.2d 1242, 1252 (Ohio Ct. App. 2009) (concluding that an Ohio sales tax against satellite providers but not against cable providers survived dormant Commerce Clause scrutiny because "the two classes of competitors cannot be segregated into interstate and local enterprises," and the law "does not discriminate against interstate commerce as a whole"), *aff'd* 941 N.E.2d 1187, 1196 (Ohio 2010) (explaining that in the cases cited by the satellite companies "the respective states acted to protect local interests at the expense of out-of-state competitors").

[17] *See DIRECTV, Inc. v. State, Dep't of Revenue*, Civ. No. 1D13-5444, 2015 WL 3622354, at *4 (Fla. Dist. Ct. App. June 11, 2015); *DIRECTV, Inc. v. Roberts*, Civ. No. 032408IV, 2013 WL 9973065, (Tenn. Ch. June 21, 2013), *rev'd DIRECTV, Inc. v. Roberts*, Civ. No. M201301673, 2015 WL 899025 (Tenn. Ct. App. Feb. 27, 2015); *DIRECTV, Inc. v. Wilkins*, Civ. No. 03CVH06-7135 (Ohio Ct. C.P., Franklin Cty., Oct. 17, 2007), *rev'd DIRECTV, Inc. v. Levin*, 907 N.E.2d 1242, 1251–52 (Ohio Ct. App. 2009).

¶44 Many decades ago the Supreme Court described its dormant Commerce Clause caselaw as a "quagmire." *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959). Not much has changed in the interim, except perhaps to add more "room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *Id.* at 457. Yet we must of course decide the cases that come before us, mindful of our role as a lower court to follow controlling precedent from the U.S. Supreme Court.

¶45 In so doing, we are reluctant to extend dormant Commerce Clause precedent in new directions not yet endorsed by that court. The high court's precedents in this area seem rooted more in "case-by-case analysis" than in any clear, overarching theory. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994). In a field like this one, it is more difficult than usual for a lower court to anticipate expansions of the law into new territory, as any decision to do so seems more like common-law decision-making than constitutional interpretation. The principle of *dormant* commerce, after all, is not rooted in a *clause*, but in a negative implication of one; so there is a dearth of any textual or historical foundation for a court to look to.

¶46 Our hesitance to extend the law of dormant commerce is reinforced by a practical problem: The extension advocated by the satellite providers would open a can of worms. Varying business models are available in most any field. And the choice among business models will often have a differential impact on the local economy (and a different "footprint"). If the courts are to embark on a constitutionally mandated journey limiting the longstanding police powers of state and local governments to regulate business, it should be the U.S. Supreme Court that makes that decision. We do not think it has. And since a move in that direction would require subjective line-drawing that would take us far afield of the Court's current approach, we doubt that it will.

### III. THE UNIFORM OPERATION OF LAWS CLAUSE

¶47 The Utah Constitution requires that "[a]ll laws of a general nature . . . have uniform operation." UTAH CONST. art. I, § 24. As we noted recently, this provision implicates two separate strands

of constitutional analysis. *See State v. Canton*, 2013 UT 44, ¶¶ 34–35, 308 P.3d 517. First, the traditional (historical) application of the "uniform operation" guarantee is directed to application or enforcement of the law by the executive. *See id.* ¶ 34. "[A]t the time of the ratification of the Utah Constitution, parallel provisions in other state constitutions were not viewed as a limit on the sorts of classifications that a legislative body could draw in the first instance, but as a rule of uniformity in the actual application of such classifications—[a] requirement of consistency in application of the law to those falling within the classifications adopted by the legislature, or in other words a prohibition on special privileges or exemptions therefrom." *Id.*

¶48 This strand of uniform operation analysis is not implicated here. The satellite providers are not complaining that the Tax Commission has granted special privileges or exemptions to a law that is more general on its face. Their complaint concerns legislative classification.

¶49 That sort of claim implicates the second strand of our uniform operation of law jurisprudence. This strand "treats the requirement of uniform operation as a state-law counterpart to the federal Equal Protection Clause." *Id.* ¶ 35. Under our governing standard, we ask (a) "what classifications the statute creates," (b) "whether different classes . . . are treated disparately," and then (c) "whether the legislature had any reasonable objective that warrants the disparity" among any classifications. *Id.* ¶ 35 (quoting *State v. Angilau*, 2011 UT 3, ¶ 21, 245 P.3d 745).

¶50 This final step "incorporates varying standards of scrutiny." *Id.* ¶ 36. Of particular relevance here, this step "recognize[s] that most classifications are presumptively permissible, and thus subject only to 'rational basis review.'" *Id.* Thus, we limit heightened scrutiny for the narrow band of cases involving "discrimination on the basis of a 'suspect class' (e.g., race or gender)," or discrimination on the basis of a "fundamental right." *Id.* (citation omitted).

¶51 The satellite providers have failed to state a claim under this standard. They have not alleged that the pay-TV tax credit classifies on the basis of race or gender or any other suspect class.

Nor have they claimed that it infringes a fundamental right. So, as in *Canton*, the "governing standard of review" applicable to the tax credit is "rational basis." *Id.* ¶ 40. And that standard is a most forgiving one. We have suggested that it is especially so with respect to economic regulations. *See Merrill v. Utah Labor Comm'n*, 2009 UT 26, ¶ 9, 223 P.3d 1089. In that realm we have said that any rational or "reasonable" basis for legislative classification is sufficient, meaning that any "legitimate" governmental objective suffices, and any "reasonable relationship" between classification and purpose is adequate. *Id.*

¶52 This is essentially the federal equal protection standard. Both the federal courts and this court have used the "rational basis" term as shorthand.[18] And our approach seems to mirror the federal standard in all relevant respects.[19] That is not to say that we are bound to follow federal law. Although we "generally incorporate principles from the federal equal protection regime," we have also "reserv[ed] the right to depart from those standards." *Canton*, 2013 UT 44, ¶ 36 n.9. "Yet our precedent to date has offered little basis or explanation for the extent of any difference between the federal equal protection guarantee and the state requirement of uniform operation." *Id.* And here, as in *Canton*, "the parties . . . have not ventured anything along those lines in their briefs." *Id.*

¶53 So we apply the standard "rational basis" test. And we hold that the satellite companies' claim fails as a matter of law under that test, as the "rationality of the [credit's] classification is quite apparent." *See id.* ¶ 40. The most obvious ground for limiting the tax credit to cable providers is the one highlighted in our dormant commerce analysis above—only cable companies incur franchise fees, and the tax credit is an offset for those fees. That

---

[18] *See Merrill v. Utah Labor Comm'n,* 2009 UT 26, ¶ 8, 223 P.3d 1089, *on reh'g,* 2009 UT 74, ¶ 8, 223 P.3d 1099; *see also Purdie v. Univ. of Utah*, 584 P.2d 831, 832 (Utah 1978).

[19] *See State v. Canton*, 2013 UT 44, ¶ 36 n.9, 308 P.3d 517 (noting that "our cases generally incorporate principles from the federal equal protection regime" (citing *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989))).

alone is sufficient. But other rational grounds are apparent—such as the aim of removing "barriers" to the continued viability of cable in an effort to assure certain services they provide, like internet access and public access channels.[20] So the satellite providers' Uniform Operation of Laws Clause challenge fails as well, and we accordingly affirm the district court's decision dismissing their complaint.

––––––––––––

---

[20] *See DIRECTV, Inc. v. Treesh*, 487 F.3d 471, 480–81 (6th Cir. 2007) (recognizing this and other rational grounds for giving cable companies a tax benefit not extended to satellite companies).