*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 47**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ROBERT C. STEINER and WENDY STEINER-REED,
*Appellants and Cross-Appellees,*

*v.*

UTAH STATE TAX COMMISSION,
*Appellee and Cross-Appellant.*

No. 20180223
Filed August 14, 2019

On Direct Appeal

Third District, Salt Lake
The Honorable Noel S. Hyde
No. 170901774

Attorneys:

Peter W. Billings, William H. Adams, Nora K. Brunelle, David P. Billings, Salt Lake City, for appellants and cross-appellees

Sean D. Reyes, Att'y Gen., Stanford E. Purser, Deputy Solic. Gen., Erin T. Middleton, Asst. Solic. Gen., John C. McCarrey, Mark E. Wainwright, Asst. Att'y Gens., Salt Lake City, for appellee and cross-appellant

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 The Utah State Tax Commission disallowed certain tax deductions claimed by Robert and Wendy Steiner on their tax returns. The Steiners filed a challenge to that determination in the tax court. In that forum, the Steiners asserted that the United States

Constitution, specifically the Dormant Commerce Clause and the Dormant Foreign Commerce Clause,[1] mandated that Utah allow their claimed deductions relating to (1) income earned in the United States but outside of Utah and (2) income earned in foreign countries. The Steiners also cited the Utah Code section 59-10-115(2), in support of their latter claim. The tax court agreed in part. It allowed the second set of deductions but disallowed the first.

¶2   Both parties appealed. We affirm in part and reverse in part. We agree with the State and hold that neither set of deductions is mandated by the United States Constitution. Nor are the deductions required by the Utah Tax Code.

¶3   Our constitutional analysis is in line with our 2015 decision in *DIRECTV v. Utah State Tax Commission*, 2015 UT 93, 364 P.3d 1036. There we noted the lack of any textual or originalist mooring for the doctrine that has built up around the concept of dormant commerce, while also lamenting the lack of any "clear, overarching theory" in the decisions of the United States Supreme Court in this field. *Id.* ¶ 45. We acknowledged, of course, our duty to follow controlling precedent from that court. But we emphasized the difficulty of "anticipat[ing] expansions of the law" in this field "into new territory" not yet explored by the Supreme Court. *Id.* And in the absence of clear direction (in text, history, or precedent), we declined to make a guess about the direction the case law might take in the next case that comes before the Supreme Court. *Id.*

¶4   We resolve this case on this basis. We find no controlling precedent from the United States Supreme Court that mandates a decision striking down the challenged Utah tax provisions on dormant commerce grounds. And we uphold their constitutionality on that basis.

I

¶5   The Steiners filed joint tax returns as Utah residents in tax years 2011, 2012, and 2013. Although their income included earnings

---

[1] Throughout this opinion we refer to both the "Dormant Commerce Clause" and the "Dormant Foreign Commerce Clause." We refer to them this way, despite the fact that we cannot find either such clause in our copy of the United States Constitution, for the sake of simplicity and concision.

from various sources, the only component at issue on appeal is the tax on business income earned by Robert Steiner (Steiner).

¶6 Steiner is a shareholder of Steiner, LLC, which is taxed as an S corporation.[2] He is also a beneficiary of the G.A. Steiner Trust (the Trust), which is the majority shareholder of Steiner, LLC. The Steiners' income from Steiner, LLC during the relevant period included both amounts passed directly to Steiner by virtue of his direct stake in Steiner, LLC and amounts attributable to Steiner as a beneficiary of the Trust.

¶7 Steiner, LLC is the sole shareholder of Alsco, Inc. Alsco is a textile rental business, which along with its subsidiaries does business in the United States and around the world. Alsco and all of its subsidiaries that do business in the United States have elected to be taxed as Qualified S Subsidiaries. Thus, all of the income derived from these entities is passed through to Steiner, LLC. Steiner, LLC, in turn, passes the income through to its individual shareholders, including Steiner. Such income is accordingly reflected on the Steiners' joint tax returns. Most of Alsco's foreign subsidiaries have elected to be taxed as partnerships for U.S. tax purposes. Ninety-nine percent of the income from each subsidiary is passed through to Alsco as a partner. This income goes through the same pass-through waterfall and ends up on the Steiners' joint tax returns as well.

¶8 On their federal tax returns during the relevant years the Steiners claimed, and received, a tax credit for the taxes they had paid to foreign jurisdictions. On their Utah tax returns, the Steiners claimed a state tax credit for taxes they paid to other states. These credits are explicitly allowed by the Utah Tax Code. UTAH CODE § 59-10-1003. But the Steiners also claimed an "equitable adjustment" under Utah Code section 59-10-115—an adjustment excluding foreign income from their Utah taxable income.

---

[2] That means that Steiner, LLC itself does not pay any federal or state-level tax. *See* 26 U.S.C. § 1363; UTAH CODE § 59-10-1403(1). All of its income passes through to individual shareholders' tax returns (in proportion to their ownership interest). 26 U.S.C. § 1366; UTAH CODE § 59-10-1403.1(2). The individuals then pay taxes on the amount passed through to their individual returns. 26 U.S.C. § 1366.

¶9   The Utah State Tax Commission[3] audited the Steiners' tax returns. The Commission disallowed the "equitable adjustment" for foreign income. But it also recalculated the state tax credit and determined that the Steiners were entitled to a larger credit than they had claimed.

¶10 The Steiners filed a Petition for Redetermination challenging the Commission's disallowance of the equitable adjustment for foreign income. In a subsequent amendment to their petition, the Steiners also challenged Utah's state tax credit system. They asked the Commission to make a determination that only the portion of Steiner, LLC's income that is apportioned to Utah should be included in taxable income for Utah purposes.[4] The Steiners also raised constitutional challenges to Utah's tax scheme in their petition.

¶11 The Commission conducted a formal hearing on the Steiners' petition and later issued a final decision in which it upheld the original audit determination and denied the Steiners' new apportionment claim.  The Commission lacked jurisdiction to hear the constitutional claims and thus declined to address them.

¶12 After this adverse ruling, the Steiners paid the assessed tax deficiency (plus statutory interest) pursuant to Utah Code section 59-1-611. They then appealed to the third district tax court for a "de novo" review of the Commission's determination. *See* UTAH CODE § 59-1-601. In the tax court, both parties moved for summary judgment. The tax court first ruled that Utah's tax treatment of income earned in other states did not run afoul of the Dormant Commerce Clause. Specifically, the court held that the Dormant Commerce Clause did not require apportionment of the Steiners' income and that Utah's tax credit system satisfied the requirements

---

[3] Some of the actions in this case were undertaken by subdivisions of the Commission (specifically the Auditing Division). Because the distinctions are not relevant, we refer to all of the entities collectively as the Commission for the sake of simplicity.

[4] Apportionment involves allocation of corporate business income to Utah by comparing a corporation's Utah-specific presence with its overall payroll, property, sales, and so forth. UTAH CODE § 59-7-311. Only the proportion of income attributable to Utah is then taxed by Utah.

of that clause. The court went on to rule that the Steiners were entitled to claim an equitable adjustment for their foreign business income. The court's ruling in this regard, although ultimately based on statutory grounds, was driven by constitutional concerns. In particular, the tax court believed that the Dormant Foreign Commerce Clause mandated that Utah allow foreign business income to be deducted. The tax court thus remanded the case to the Commission so it could apply the equitable adjustment to the Steiners' income. Both parties filed notices of appeal to this court pursuant to Utah Code section 59-1-608.

## II

¶13 The Commerce Clause grants Congress the authority to regulate interstate commerce. U.S. CONST. art. I, § 8, cl. 3. "By negative implication," the United States Supreme Court has held that "this provision also limits the states' authority in this realm." *DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶ 13, 364 P.3d 1036. "So even if Congress has not spoken on an issue of interstate commerce, states are prevented from encroaching on Congress's authority—hence the term 'dormant' or 'negative' Commerce Clause." *Id*. We must decide how to apply this negative implication to the Utah Tax Code.

¶14 This case presents three distinct questions for our resolution: (1) whether the Dormant Commerce Clause requires Utah to apportion a residency-based income tax instead of simply granting a credit for taxes paid to other states; (2) whether the Dormant Foreign Commerce Clause requires Utah to allow a deduction for income earned in foreign countries; and (3) whether Utah's "equitable adjustment" statute, Utah Code section 59-10-115(2), mandates a deduction for foreign income.

¶15 We answer each of these questions in the negative, explaining our reasoning below. But before diving into the specifics, we lay out some background on our general jurisprudential approach to dormant commerce issues.

## A

¶16 Decades ago the United States Supreme Court likened its case law under the Dormant Commerce Clause to a "quagmire." *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959). That was an apt metaphor at the time. It seems even more so today.

¶17 The Supreme Court's body of dormant commerce jurisprudence has multiplied several-fold in the decades since the *Portland Cement* case. But "[n]ot much has changed . . . , except

perhaps to add more room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *DIRECTV*, 2015 UT 93, ¶ 44 (citation and internal quotation marks omitted). This is unfortunate. The lower courts are operating largely in the dark in this important field of constitutional law. "Yet we must of course decide the cases that come before us, mindful of our role as a lower court to follow controlling precedent from the U.S. Supreme Court." *Id.*

¶18 In carrying out our duty, however, "we are reluctant to extend dormant Commerce Clause precedent in new directions not yet endorsed" by the Supreme Court. *Id.* ¶ 45. Because the high court's rulings in this area have proceeded on an *ad hoc* basis lacking "any clear, overarching theory," we have noted the difficulty of the task of a lower court in attempting to "anticipate expansions of the law into new territory." *Id.* And with this in mind, we have warned of the perils of a lower court reading tea leaves in this field.

¶19 We have acknowledged, of course, the Supreme Court's prerogative to place limits on the "longstanding police powers of state and local governments to regulate business." *Id.* ¶ 46. But in light of the *ad hoc* nature of that court's precedents, we have warned that "it should be the U.S. Supreme Court" that leads the way in charting new territory in this field. *Id.*

¶20 We follow this same approach here. We will, of course, faithfully apply controlling precedent. But we decline to extend that precedent into new territory—even in ways that might seem logical in other jurisprudential realms. We do that not out of any disrespect for the United States Supreme Court, but in our best attempt at judicial humility in a constitutional field marked more by haphazard policy judgments than any unifying legal theory. In such a field it would seem presumptuous to make our own guess about the next move the high court might make as it extends its precedent. And we will thus leave it to that court to mark the next extension in this field.

B

¶21 Like many states, Utah taxes its residents on all of their income, regardless of where it is earned. But Utah also grants its residents credits for taxes they have already paid to other states. This ensures that Utah residents' income is not subject to taxation by both Utah and another state.

¶22 The Steiners nevertheless contend that this taxation scheme violates the Dormant Commerce Clause because it taxes a disproportionate share of the income they earned outside of Utah.

They are mistaken. We hold that Utah's provision of credits for income taxes already paid to other states satisfies the dormant commerce requirements set forth in controlling precedent.[5]

¶23 The seminal case in this area is *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977). *Complete Auto* is the origin of the four-part test used to assess state taxes for compliance with the Dormant Commerce Clause. But the *Complete Auto* framework was altered by the Supreme Court's more recent decision in *Comptroller of the Treasury of Maryland v. Wynne*, 135 S. Ct. 1787 (2015). In light of the complexity of the case law in this area, we first outline the evolution of Dormant Commerce Clause jurisprudence prior to *Wynne*. We next explain how *Wynne* changed the governing framework. Finally, we apply *Wynne* to conclude that Utah's tax scheme is constitutional.

1

¶24 The modern framework for evaluating the validity of state taxes under the Dormant Commerce Clause has its origins in *Complete Auto*, 430 U.S. 274. In that case the high court overruled the previously governing analytical approach established in *Freeman v. Hewit*, 329 U.S. 249 (1946), and *Spector Motor Service v. O'Connor*, 340 U.S. 602 (1951). Those cases established what was known as the "Spector Rule"—that "a tax on the 'privilege' of engaging in an activity in the State may not be applied to an activity that is part of interstate commerce." *Complete Auto*, 430 U.S. at 278. The *Complete Auto* Court discarded the Spector Rule on the ground that it represented a "triumph of formalism over substance." *Id.* at 281.

¶25 Apart from its expressed dissatisfaction with the formalist nature of the Spector Rule, the *Complete Auto* Court offered very little in the way of an analytical explanation of its basis for a new legal framework in this field. Instead the Court just made brief note of four claims that the taxpayer had *not* made in that case. *Id.* at 287. The Court stated, almost in passing, "that no claim is made that the activity is not sufficiently connected to the State to justify a tax, or that the tax is not fairly related to benefits provided the taxpayer, or

---

[5] The tax court granted summary judgment in favor of the Commission on this issue. We review summary judgment decisions for correctness, granting no deference to the lower court's legal conclusions. *Salt Lake Cty. v. Holliday Water Co.*, 2010 UT 45, ¶ 14, 234 P.3d 1105.

that the tax discriminates against interstate commerce, or that the tax is not fairly apportioned." *Id.*

¶26  This offhand statement was eventually elevated into a "test." *See D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 30 (1988). To pass Dormant Commerce Clause scrutiny under this "test," a state tax must: (1) apply to an activity with a substantial nexus to the state, (2) be fairly apportioned, (3) not discriminate against interstate commerce, and (4) be fairly related to the services the state provides. *Id.* Only the fair apportionment prong is at issue in this appeal.

¶27 The Supreme Court has further subdivided the fair apportionment prong into two parts—internal consistency and external consistency. *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 169 (1983). Internal consistency requires an analysis of the inherent characteristics of the state tax system. Under this analysis we assume that every state uses Utah's tax system, and assess whether, in this hypothetical world, there is systematic discrimination against interstate commerce. *Wynne*, 135 S. Ct. at 1801–02. External consistency, on the other hand, requires that state taxes "reflect a reasonable sense of how income is generated." *Container Corp.*, 463 U.S. at 169. To evaluate this question, a court must assess "whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg v. Sweet*, 488 U.S. 252, 262 (1989). This essentially requires states to apportion income, and tax only that part of the income attributable to in-state activity.

¶28  Prior to *Wynne* there was considerable uncertainty regarding the continued vitality of both of these two components. *See, e.g., Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 196 (1995) (declining to require external consistency of sales taxes for sake of "simplicity"); Walter Hellerstein, *Is "Internal Consistency" Dead?: Reflections on an Evolving Commerce Clause Restraint on State Taxation*, 61 TAX. L. REV. 1, 26 (2007). Despite this confusion, neither test has been expressly overruled by the Supreme Court. With this in mind, the Steiners assert that Utah's tax scheme, as applied to them, must satisfy *both* the internal and external consistency tests. If the tax fails to do this, in their view, it does not survive the Dormant Commerce Clause challenge.

¶29  To see why this assertion is mistaken, we have to take a detailed look at the *Wynne* decision.

¶30 *Wynne* was a challenge brought by individual taxpayers against Maryland's tax statutes. The Wynnes sought two important extensions to the Supreme Court's then-existing Dormant Commerce Clause jurisprudence. First, they wanted the Court to apply the clause to an individual (rather than a corporation) for the first time. Second, they wanted the Court to apply the clause to a residency-based income tax—also for the first time.

¶31 Like the Steiners, the taxpayers in *Wynne* were shareholders of an S corporation. *Wynne*, 135 S. Ct. at 1793. The Wynnes were residents of Maryland. *Id.* At the time of that case, Maryland imposed two levels of state taxation—first, a state income tax, which Maryland levied at a graduated rate; and second, a county income tax, which varied based on geography but was levied at a flat rate. *Id.* at 1792. Despite the differing nomenclature, both taxes were collected directly by the state of Maryland. *Id.* Maryland allowed taxpayers to claim a credit for taxes paid to other states, but only against the "state" tax—not the "county" tax. *Id.* Maryland residents were thus subject to double taxation on their income earned in other states. Income was taxed by the other state via that state's taxation regime and Maryland via its flat rate county tax. Maryland also taxed the income of nonresidents. *Id.* Nonresidents paid the state income tax on all income they earned within Maryland. *Id.* They also had to pay a "special nonresident tax" instead of the county tax. *Id.* This tax was equivalent to the lowest county income tax rate. *Id.* The Wynnes claimed that this system violated the Dormant Commerce Clause.

¶32 The Supreme Court agreed. As a threshold matter the Court noted that "it is hard to see why the dormant Commerce Clause should treat individuals less favorably than corporations." *Id.* at 1797. It thus concluded, with little analysis, that individuals are also protected by the Dormant Commerce Clause—even though the Court had previously never explicitly held as much.[6] The Wynnes, as

---

[6] The *Wynne* case is a departure from the Court's previous position that an individual's residence in a state subjected him, in full, to that state's taxation regime. Indeed, as the principal dissent noted, "the sheer volume and consistency of [the Court's] precedent confirms . . . the degree to which this Court has—until now—endorsed the well-established principle . . . that a State may tax its

(continued . . .)

shareholders of an S corporation, accordingly fell within the ambit its protection.

¶33 The Court then went on to assess the substance of the Maryland tax. But in doing so, it sailed past the four-part *Complete Auto* test and assessed the Maryland tax only on internal consistency grounds. Although the Court noted that the Maryland Court of Appeals applied the full *Complete Auto* test, *id.* at 1793, it did not endorse or apply the full test anywhere in its opinion. Nor did it state that it was simply unnecessary to apply the remaining prongs because one of the prongs was dispositive. Instead, it at least implicitly treated internal consistency as a standalone constitutional test. The continuing vitality of the *Complete Auto* test is thus in serious doubt.[7]

¶34 *Wynne* also introduced uncertainty into the fair apportionment prong. As discussed above, *supra* ¶ 27, the fair apportionment requirement consists of two subparts—internal consistency and external consistency. The *Wynne* Court first concluded that Maryland's tax failed the internal consistency test. The Court imagined a simplified world in which every state had the same taxation system as Maryland. *Id.* at 1803. The Court then

> [a]ssume[d] further that two taxpayers, April and Bob, both live in State A, but that April earns her income in State A whereas Bob earns his income in State B. In this circumstance, Bob will pay more income tax than April solely because he earns income interstate. Specifically, April will have to pay a 1.25% tax only once, to State A. But Bob will have to pay a 1.25% tax twice: once to State A, where he resides, and once to State B, where he earns the income.

residents' worldwide income, without restriction arising from the source-based taxes imposed by other States and regardless of whether the State also chooses to impose source-based taxes of its own." *Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1818 (2015) (Ginsburg, J., dissenting) (citation and internal quotation marks omitted).

[7] We flag this point without conclusively resolving it. We need not decide whether *Wynne* dispensed with *Complete Auto* because only the fair apportionment prong is at issue in this case.

*Id.* at 1803–04. Based on this hypothetical, the Court determined that the Maryland tax systematically discriminated against interstate commerce and thus failed the internal consistency test. *Id.* at 1803. And in light of this failure, the Court held that Maryland's tax failed to survive the Dormant Commerce Clause challenge. *Id.*[8]

¶35 So far so good. Because Maryland's tax failed the internal consistency test, the Supreme Court need not have reached the external consistency test since a failure on either prong would have been determinative. But the Court went on to propose a potential solution to Maryland's problem. Significantly, the Court's proposed solution is one that would fail the external consistency test.

¶36 The *Wynne* Court suggested that Maryland could fix the problem with its tax code by eliminating the special nonresident tax, but continuing to tax all of its residents' income regardless of source. *Id.* at 1806. Yet this solution would fail the external consistency requirement. The proposed system would allow Maryland to levy the county tax on 100 percent of its residents' income generated outside of Maryland. Maryland would apportion none of this income to other states. Crucially, *it would not even have to grant a credit for taxes paid to other states* (as long as it didn't tax nonresidents).[9] This "would seem to squarely violate the external consistency test," which requires states to apportion income such that it "reflect[s] a reasonable sense of how income is generated." *Dormant Commerce Clause — Personal Income Taxation — Comptroller of the Treasury of Maryland v. Wynne*, 129 Harv. L. Rev. 181, 186–87 (2015) (internal quotation marks and emphasis omitted). This tax system does not even come close to "slicing [the] taxable pie among [the] States in which the taxpayer's activities contributed to taxable income."

---

[8] This despite the fact that the Court had upheld internally inconsistent state taxes before. *See, e.g., Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 437 (2005); *Shaffer v. Carter*, 252 U.S. 37, 57 (1920). So much for consistency.

[9] As long as Maryland taxes only residents, the tax system is internally consistent. If every state taxed based only on residency (and not based on the source of the income), there would be no discrimination against interstate commerce. A person living in State A would pay only State A taxes, and a person living in State B would pay only State B taxes. There would be no differing tax burden based on the interstate nature of the income.

*Jefferson Lines*, 514 U.S. at 186. Maryland would be entitled to tax the out of state "slice" simply because the taxpayer resided in Maryland. But slicing the tax pie is the quintessential point of external consistency.

¶37 The *Wynne* Court thus went out of its way to endorse a tax regime violative of the external consistency test. Whatever life external consistency might have left, it is highly unlikely that it continues to apply in the context of an individual taxpayer's challenge to a state's taxation system.[10]

¶38 To summarize, *Wynne* struck down Maryland's tax system solely on the basis of internal consistency. The Court did not apply the *Complete Auto* test. And it strongly implied that tax systems that fail external consistency would nonetheless pass constitutional muster.

¶39 The task that remains, then, is to assess Utah's tax scheme under the guidelines laid out in *Wynne*.

3

¶40 We can distill several principles from *Wynne* that bear on the Steiners' first claim: (1) As shareholders of an S corporation, the Steiners are entitled to bring a Dormant Commerce Clause challenge; (2) Utah's tax regime *must* satisfy the internal consistency test; and (3) Utah's tax regime need not satisfy the external consistency test. The Steiners' challenge will rise and fall, then, on a showing of internal inconsistency in Utah's tax code.

---

[10] Although we are unaware of any judicial opinions reaching this precise conclusion, there is significant scholarly commentary along these lines. *See, e.g.*, Mackenzie Catherine Schott, Comment, *Inconsistency with the Internal Consistency Test*, 77 LA. L. REV. 947 (2017) (arguing that *Wynne* established internal consistency as a standalone constitutional test); Edward A. Zelinsky, *The Enigma of* Wynne, 7 WM. & MARY BUS. L. REV. 797, 809–10 (2016) (noting that *Wynne* "can be read as presaging a future formal repudiation of the external consistency test"); *Dormant Commerce Clause – Personal Income Taxation – Comptroller of the Treasury of Maryland v. Wynne*, 129 HARV. L. REV. 181, 188 (2015) (asserting that *Wynne* demonstrates that the Supreme Court is "hesitant to apply the [external consistency] test").

¶41 We uphold the constitutionality of the Utah tax scheme at issue under these principles. Because Utah's tax system is internally consistent, we hold that the Steiners' Dormant Commerce Clause challenge fails on the merits.

¶42 For the years in question, Utah taxed its residents' state taxable income at a rate of 5 percent. UTAH CODE § 59-10-104 (2013). Utah residents who paid income taxes in other states could take a credit against their Utah taxes in the amount of taxes they paid to other states, up to the amount that they would have paid under Utah's tax rate. *Id.* § 59-10-1003. Nonresidents were also taxed at the same rate of 5 percent, but only on their income earned in Utah. *Id.* § 59-10-103(1)(w), -104(2), -116.

¶43 This arrangement satisfies *Wynne*'s internal consistency test. If every state adopted the same tax system as Utah, there would be no discrimination against interstate commerce. April and Bob (our hypothetical taxpayers)—who are both residents of State A—pay the same tax even though April earns her income in State A and Bob earns his in State B. April will pay a 5 percent tax to State A on her income because she resides there. Bob will pay a 5 percent tax to State A because he resides there and a 5 percent tax to State B because he earns income there, but he will receive a credit in State A for the 5 percent tax paid to State B. Like April, he will be taxed only once on his income. Bob does not shoulder a higher tax burden even though he earns his income in interstate commerce.[11] This conclusion is bolstered by the *Wynne* majority's statement that "Maryland could cure the problem with its current system by granting a credit for taxes paid to other States." 135 S. Ct. at 1806. This is exactly what Utah does.

¶44 Utah's tax code thus satisfies the internal consistency test. In *Wynne*, the Supreme Court declined to require anything else of Maryland's tax. We accordingly apply *Wynne* and conclude that a

---

[11] It is true that some states have a 0 percent income tax, and no credit against Utah taxes is thus available for income earned in those states (because no taxes are paid to those states). But this is immaterial to the analysis. Internal consistency analyzes only the effects of a state's *own* tax system. The fact that a given state's system might generate odd results because of its interaction with the systems of *other* states is irrelevant. *See Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995).

state tax levied against individuals need satisfy only the internal consistency test to pass Dormant Commerce Clause scrutiny.[12] It would be an extension of *Wynne* to require that these taxes also satisfy external consistency. If the Supreme Court wishes to mandate such an extension, it is of course free to do so. But we will not do so here.

C

¶45 The Steiners also assert a challenge to Utah's tax code under the Dormant Foreign Commerce Clause.[13] They contend that Utah's failure to grant a credit for taxes already paid to foreign countries impermissibly discriminates against international commerce. The tax court agreed and allowed the Steiners to deduct their foreign income under the equitable adjustment statute so as to avoid what it viewed as an otherwise unconstitutional result. We reverse. There is no Supreme Court case in which that Court has struck down a state tax on the foreign income of an individual or an S corporation. We decline to break new ground here—if the Dormant Foreign Commerce Clause is going to be extended to individuals "it should be the United States Supreme Court that makes that decision." *DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶ 46, 364 P.3d 1036. The protections of the Dormant Foreign Commerce Clause have been extended only to corporations. And even if the clause did apply to the Steiners, the requirements are met here. Accordingly, we hold that Utah's tax system does not run afoul of the Dormant Foreign Commerce Clause.[14]

---

[12] As discussed previously, only the fair apportionment prong of the *Complete Auto* test is at issue before us. So although a fair reading of *Wynne* is that it may have discarded that test entirely, we need not decide the issue. It is enough for our purposes to conclude that after *Wynne*, "fair apportionment" means the same as "internal consistency" in this context.

[13] The Dormant Foreign Commerce Clause is analogous to the Dormant Commerce Clause. But whereas the latter is derived by negative implication from the Commerce Clause, the former finds its footing (or lack thereof) in the Foreign Commerce Clause.

[14] We review the tax court's grant of summary judgment for correctness. *Salt Lake Cty. v. Holliday Water Co.*, 2010 UT 45, ¶ 14, 234 P.3d 1105.

1

¶46 No Supreme Court case considering the Dormant Foreign Commerce Clause has involved an individual taxpayer (or S corporation shareholder). They have all involved C[15] corporations.[16] The Supreme Court has never indicated that a state—taxing an *individual* based on his residency in that state—could run afoul of the Constitution by failing to grant a tax credit against taxes levied by foreign countries. Under the principles we articulated in *DIRECTV* that alone is enough to end the inquiry. We could conclude otherwise only by transplanting *Wynne* into the Court's foreign commerce clause jurisprudence. But we find no established basis for *Wynne* to be extended into this area.

¶47 As discussed above, *Wynne* established—for the first time—that a state tax levied against an individual who resided in that state was subject to the Dormant Commerce Clause. *Supra* ¶ 32. Justice Alito, writing for the Court, noted that "it is hard to see why the dormant Commerce Clause should treat individuals less favorably than corporations." *Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1797 (2015). Crucially, however, the Court applied a different doctrinal framework to the individual taxpayers in *Wynne* than the one previously applied to corporations.

¶48 *Wynne* adopted the internal consistency test as a freestanding constitutional requirement. *Id.* at 1803. In its previous cases, however, the Court applied this test as one part of the broader *Complete Auto* framework. *See, e.g.*, *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 30 (1988). And what's more, the failure of a tax to pass the internal consistency test was not previously fatal. *See, e.g.*, *Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 437 (2005); *Shaffer v. Carter*, 252 U.S. 37, 57 (1920). Thus despite the Court's

---

[15] C corporations file corporate tax returns and pay federal and state corporate-level taxes on the entity's business and non-business income. 26 U.S.C. § 11; UTAH CODE § 59-7-101 *et seq.*

[16] *See Barclays Bank PLC v. Franchise Tax Bd. Of Cal.*, 512 U.S. 298 (1994*); Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60 (1993); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin*, 505 U.S. 71 (1992); *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1 (1986); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159 (1983); *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 U.S. 425 (1980); *Japan Line, Ltd. v. Cty. Of Los Angeles*, 441 U.S. 434 (1979).

insistence that individuals are entitled to be treated no "less favorably" than corporations under the Dormant Commerce Clause, it is clear that they can be treated differently. Crucial distinctions between individuals and corporations continue to exist as a doctrinal matter. Logically, then, individuals and corporations may also be subjected to differing analytical frameworks under the Dormant Foreign Commerce Clause. But the Supreme Court has provided no guidance whatsoever to lower courts regarding how to treat individuals in the context of *foreign* commerce. So even if we were inclined to conclude that state taxes of individual residents are subject to Dormant Foreign Commerce Clause scrutiny, we would be completely at sea. We would have no idea what test to apply or how to apply it.[17]

¶49 "Our hesitance to extend the law of dormant commerce is reinforced by a practical problem: The extension advocated by the [Steiners] would open a can of worms." *DIRECTV*, 2015 UT 93, ¶ 46. This practical problem is amply illustrated by the Steiners' own briefing. In seeking to extend *Wynne* to foreign commerce, the Steiners attempt to apply the internal consistency test. As discussed, this test requires analyzing a hypothetical world in which all jurisdictions have the challenged tax scheme. We then would assess if interstate commerce suffers from systematic discrimination in this alternate world. But this test is quite impossible to apply in an international setting. *Wynne*'s internal consistency analysis contemplated only state-level taxes within a uniform federal system. And the international income earned by the Steiners is subject to multiple levels of foreign taxation—local, subnational, and national. It would make no sense to universalize Utah's tax system to conduct a *Wynne* analysis—Utah is a single, subnational taxing jurisdiction. There is no proper basis to compare the effect of its tax system with

---

[17] This difficulty is exacerbated by the fact that the governing Dormant Foreign Commerce Clause framework is not identical to the domestic framework. *See, e.g., Itel Containers Int'l Corp.*, 507 U.S. at 73 (noting that *Complete Auto* framework is the "domestic commerce clause test"). We thus do not know (1) how the assessment of an individual tax would work as a practical matter; or (2) how it would work as a doctrinal matter. We see no basis for stumbling through these nesting layers of unknowns until the Supreme Court lights the way.

the effect of those of foreign jurisdictions encompassing multiple levels of taxation.

¶50 In light of this uncertainty, we decline to "veer[] from a principle of interstate and international taxation repeatedly acknowledged by [the Supreme Court]: A nation or State 'may tax *all* the income of its residents, even income earned outside the taxing jurisdiction.'" *Wynne*, 135 S. Ct. at 1813 (Ginsburg, J. dissenting) (quoting *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 462–63 (1995)). Although the Supreme Court has chosen to depart from this settled rule in the context of domestic taxation, it has given no indication of its intent to extend that approach to state taxation of foreign commerce. "And since a move in that direction would require subjective line-drawing that would take us far afield of the Court's current approach, we doubt that it will." *DIRECTV*, 2015 UT 93, ¶ 46. We reverse the tax court and hold that Utah may tax the entirety of the Steiners' foreign income based on their residency in the state.

2

¶51 Although the Supreme Court has never articulated a test for a residence-based individual income tax, Utah's tax is consistent with the broader dormant foreign commerce principles the Court has hinted at. First, Utah's tax code interacts with the federal tax code in a manner that leads to evenhanded treatment of foreign commerce. Second, we can infer that Congress approves of Utah's tax system and has thus authorized it.

¶52 The "foreign commerce clause cannot be interpreted to demand that a State refrain from taxing any business transaction that is also potentially subject to taxation by a foreign sovereign." *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 74 (1993). Indeed, "absolute consistency, even among taxing authorities whose basic approach to the task is quite similar, may just be too much to ask." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 192 (1983). There is always some risk of double taxation in the international realm. Mitigation of this risk, however, would require complex negotiation with foreign nations—negotiations that the State of Utah is legally and practically ill-equipped to tackle.

¶53 This is a further indication of the need for leeway for states in the exercise of their taxing authority in the shadow of the Foreign Commerce Clause. *See id. at* 192 n. 31 (noting that "California . . . is in no position to negotiate with foreign governments," and thus that the risk of double taxation was no reason to invalidate the tax).

Utah's residency based individual tax may possibly subject the Steiners to a double tax on some of their income. But this alone may not be a basis for invalidating the Utah tax.

¶54 This conclusion is strengthened by the way in which Utah's tax system interacts with the federal system. The United States government has entered into a multitude of complex tax treaties with foreign nations. The federal government, consistent with these treaties, provides residents with a credit for foreign taxes already paid on foreign-sourced income. 26 U.S.C. §§ 901–09. The rules governing these tax credits are understandably extremely complex. Crucially, these treaties and rules often allow a credit against federal tax for both foreign national and subnational taxes. Richard D. Pomp and Michael J. McIntyre, *GATT, Barclays, and Double Taxation*, 8 STATE TAX NOTES 977 (1995). If the State of Utah were to also grant a foreign tax credit, foreign-sourced income would be granted the windfall of a double tax credit. This would systematically favor foreign commerce over domestic commerce. And we see no basis for the conclusion that the Dormant Foreign Commerce Clause requires such a result.[18]

¶55 Congress seems to agree. Despite the fact that dozens of states decline to grant a credit for foreign taxes, Congress has never acted to prohibit the practice or to preempt these laws in any way. Normally we would hesitate to infer anything from Congressional inaction. But the Supreme Court has specifically stated that Congress may "passively indicate that certain state practices" do not violate the Dormant Foreign Commerce Clause. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 323 (1994).[19] "[I]f a state tax

---

[18] It is true that the Supreme Court has previously stated that there is "no authority . . . for the principle that discrimination against foreign commerce can be justified if the benefit to domestic subsidiaries might happen to be offset by other taxes imposed not by [the State], but by . . . the Federal Government." *Kraft Gen. Foods*, 505 U.S. at 81. But this was before the Court articulated the principle of passive congressional approval. The interaction between federal and state statutes is important for assessing if Congress has *sub silentio* approved a state law.

[19] The Court made this statement in the context of evaluating whether a tax impaired the ability of the federal government to operate uniformly. This is ostensibly one of two additional prongs

(continued . . .)

merely has foreign resonances, but does not implicate foreign affairs, we cannot infer, absent some explicit directive from Congress" that the states must conform their taxes to federal practice. *Container Corp. of Am.*, 463 U.S. at 194 (internal alterations, quotation marks, and citations omitted).

¶56 The lack of an explicit Congressional directive may thus come close to tacit approval of these state laws. And the Court has repeatedly stated that Congress can authorize state action that would otherwise violate the Dormant Commerce Clause. *See, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 572 & n.8 (1997); *Maine v. Taylor*, 477 U.S. 131, 138 (1986). Regardless of any judicially jury-rigged multipart tests, then, this Congressional approval immunizes Utah's tax code from judicial scrutiny under the Dormant Foreign Commerce Clause.

D

¶57 Lastly, the Steiners argue that the equitable adjustment statute in Utah's tax code allows them to deduct their foreign income from their Utah tax base as a statutory matter. Applying principles of constitutional avoidance, the tax court agreed and read the relevant section to allow the deduction. We reverse. We hold that the equitable adjustment statute does not apply in this instance.

¶58 As in all cases of statutory interpretation, we begin with the text. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (affirming "our commitment to interpreting statutes according to the 'plain' meaning of their text").[20] The equitable adjustment statute

---

(along with the *Complete Auto* factors) in evaluating taxes under the Dormant Foreign Commerce Clause. But it has broader applicability. If Congress may "passively" approve of state laws for one part of the test, there is no reason its passive approval should not be attributed to the law as a whole. After all, it seems implausible that Congress would intend to signal approval for just one part of a judicially invented six-part test.

[20] We have previously suggested that statutes granting tax credits "must be narrowly construed against the taxpayer." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 10, 266 P.3d 751. Yet we have also said that we "construe tax imposition statutes liberally in favor of the taxpayer." *Id.* ¶ 31. This dichotomy presents a difficult line-drawing problem, as it is not always apparent whether a given statutory provision is better viewed as a matter of a tax "credit," on

(continued . . .)

reads, in relevant part: "[t]he commission shall allow an adjustment to adjusted gross income of a resident or nonresident individual if the resident or nonresident individual would otherwise . . . suffer a double tax detriment under this part." UTAH CODE § 59-10-115(2)(b). The question presented concerns the meaning of the phrase "double tax detriment under this part."

¶59 The Steiners contend that if any of their income is taxed twice, then they have suffered a "double tax detriment." Thus, they argue, the fact that their foreign-source income is taxed by both Utah and a foreign country entitles them to take advantage of the statute and adjust the income they report to Utah.

¶60 It's true that the Steiners have suffered a "double tax detriment" by being taxed by both Utah and a foreign country. But the statute doesn't call for adjustments for any double tax detriment—it calls for an adjustment only if the taxpayer suffers "a double tax detriment *under this part*." *Id.* (emphasis added). The words "under this part" are crucial. And "under this part" necessarily refers to the part of the tax code to which section 115 belongs—part 1 of title 59, chapter 10, entitled "Determination and Reporting of Tax Liability and Information" of the State's Individual Income Tax Act. *See id.* §§ 59-10-101–137. The clear import of that phrase is that an equitable adjustment is available only if the Utah tax code itself imposes double taxation.[21]

---

one hand, or as an element of the basis for the threshold imposition of the tax, on the other. The logic of the distinction is likewise a bit slippery. We have endorsed the notion of narrow construction of tax credits on the ground that such are a matter of legislative "grace." *See id.* ¶ 10. But there is a sense in which all tax provisions are a matter of grace, as the taxing authority could always go further in imposing a greater tax.

We flag this problem as a matter deserving greater attention in a future case. We need not resolve it here, however, as it has always been clear that the first order of business in a matter of statutory interpretation is to credit the ordinary meaning of the words enacted into law by the legislature. And here we conclude that such meaning cuts squarely against the Steiners.

[21] The tax court's invocation of the constitutional avoidance canon was thus erroneous. That canon is applicable only where the statute is "genuinely susceptible to two constructions." *Utah Dep't of*

(continued . . .)

¶61 This is fatal to the Steiners' position. Utah has not taxed their foreign income twice—it has only taxed it once. The second tax detriment they suffered was at the hands of a foreign sovereign. They cannot therefore take advantage of the equitable adjustment statute. We reverse the tax court and hold that the equitable adjustment statute applies only when Utah itself imposes double taxation.

## III

¶62 "The principle of *dormant* commerce . . . is not rooted in a *clause,* but in a negative implication of one." *DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶ 45, 364 P.3d 1036. For that reason there is a "dearth of any textual or historical foundation for a court to look to" in this field. *Id.* The problem is compounded when we search for principled guidance in precedent from the United States Supreme Court, as that Court itself has long acknowledged that its case law in this field is a bit of a "quagmire," *Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959), and its recent decisions "add more room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." *DIRECTV*, 2015 UT 93, ¶ 44 (citation and internal quotation marks omitted).

¶63 This is the legal backdrop for our decision in this case. The Steiners have raised some plausible arguments and identified some potential policy concerns with the tax regime enacted by the State of Utah. But in the absence of any clear anchors in text, history, or precedent, we are left with little more than a request that we second-guess the policy judgment of our state legislature—based on speculation about how a rather haphazard body of case law may ultimately play out in the future.

¶64 We do not see this as our role.[22] We uphold the constitutionality of the Utah tax provisions at issue on the ground

---

*Transp. v. Carlson*, 2014 UT 24, ¶ 24, 332 P.3d 900 (quoting *Almendarez–Torres v. United States*, 523 U.S. 224, 238 (1998)). Here the statute is unambiguous.

[22] *See DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶ 46, 364 P.3d 1036 (noting our "hesitance" to "limit[] the longstanding police powers of state and local governments to regulate business"); *see also*

(continued . . .)

that the Steiners have identified no basis in controlling precedent for striking them down. We also hold that they have fallen short in their attempt to identify a statutory basis for their challenge to these provisions.

---

*Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1810 (2015) (Scalia, J., dissenting) (suggesting that the dormant commerce "doctrine does not call upon us to perform a conventional judicial function," but "instead requires us to balance the needs of commerce against the needs of state governments" — "a task for legislators, not judges").