**2021 UT 60**

IN THE
**SUPREME COURT OF THE STATE OF UTAH**

STATE OF UTAH,
*Appellee*,

*v.*

JOSEPH ANDREW WATTS,
*Appellant*.

No. 20180976
Heard November 17, 2020
Filed September 28, 2021

On Direct Appeal

Fourth District Court, Provo
The Honorable Christine S. Johnson
No. 161402531

Attorneys:

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Solic. Gen.,
Salt Lake City, Christine G. Scott, Provo, for appellee

Douglas J. Thompson, Provo, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court
in which JUSTICE HIMONAS, JUSTICE PEARCE, and JUSTICE PETERSEN
joined.

ASSOCIATE CHIEF JUSTICE LEE authored an opinion concurring in the
judgment.

CHIEF JUSTICE DURRANT, opinion of the Court:

### Introduction

¶1    As part of a sexually explicit online chat, Joseph Watts sent
photographs of women with exposed breasts to someone he thought

was a thirteen-year-old girl. For this conduct, Mr. Watts was convicted by a jury of dealing in material harmful to a minor—a third degree felony under Utah Code section 76-10-1206. He appeals his conviction, arguing that this charge should have been dismissed on First Amendment grounds. Mr. Watts argues that although the photographs he sent showed nude breasts, they did not depict sexual activity[1] and so could not qualify as obscenity. Therefore, he asserts, they are protected speech under the First Amendment. We disagree. The United States Supreme Court has held that nudity on its own may be unprotected speech for minors depending on the context in which it is presented.

¶2    Mr. Watts also argues that the district court erred in considering the surrounding text messages when conducting the obscenity analysis on the photographs. But because the Supreme Court has held that it is appropriate to consider the relevant context in determining obscenity, we disagree.

¶3    Because nudity may be obscene as to minors without depicting sexual conduct, and the district court correctly considered the context of the nude photographs, Mr. Watts's argument that Utah Code section 76-10-1206 is unconstitutional as applied to his conduct fails, and we affirm his conviction.

**Background**

¶4    For several weeks, Mr. Watts chatted online with a person he believed to be a thirteen-year-old girl named Taylor. During this time, he offered to "teach" Taylor different sex acts, such as oral sex, sex with toys, and vaginal sex. Mr. Watts encouraged Taylor to masturbate and to watch videos to learn how to do so. He sent her an audio file of the sound of a female experiencing an orgasm. He made plans to meet up with Taylor to have sex with her. Mr. Watts also asked her if she wanted a woman to join them "so we could both teach you stuff?" He then sent the first nude picture, a photo of his "stripper friend" with her breasts exposed.

¶5    In all, Mr. Watts sent Taylor eight nude photographs of women with their breasts exposed. The women were posed in various positions, such as lying back, or placing a hand on a naked breast. After sending the photographs, he asked Taylor which of the women in the photographs had breasts "most like" hers and

_____

[1] Because the United States Supreme Court has held that nudity may be obscene as to minors, we do not address Mr. Watts's argument that the photographs do not depict sexual activity.

promised to try and get one of the women in the photographs to join them for sex.

¶6     But "Taylor" was really an undercover federal agent. Based on Mr. Watts's conduct, the State charged him with four counts of enticing a minor and one count of dealing in material harmful to a minor. Specifically, the harmful material charge was based on Mr. Watts's act of sending the eight photographs and asking which picture most resembled Taylor's breasts.

¶7     Mr. Watts filed a motion to dismiss the harmful material count, arguing that photographs of nude breasts cannot qualify as obscene and so were protected by the First Amendment. The district court denied the motion, and a jury subsequently found Mr. Watts guilty on all five counts. Mr. Watts appealed the harmful material conviction to the court of appeals, claiming the district court erred in denying his motion to dismiss.

¶8     The court of appeals certified the case to us, including the question of "whether, and to what degree, the obscenity-as-to-minors standard articulated in *Ginsberg v. New York*[2] applies to the second prong of the obscenity inquiry set forth in *Miller v. California*.[3]" We note, however, that we treat a certified question from the court of appeals as we would a direct appeal. In other words, the court of appeals' framing of the case in its certification does not confine our analysis in any way.

¶9     We have jurisdiction to hear this case pursuant to Utah Code section 78A-3-102(3)(b).

## Standard of Review

¶10   Mr. Watts asks us to review the district court's denial of the First Amendment arguments in his motion to dismiss. In reviewing an obscenity case, we "conduct an independent review of the record to judge the merits of a First Amendment defense . . . yielding no deference . . . to the district court's conclusions."[4]

---

[2] 390 U.S. 629 (1968).

[3] 413 U.S. 15 (1973).

[4] *Butt v. State*, 2017 UT 33, ¶ 29, 398 P.3d 1024. In this case, both parties have assumed an appellate court should apply the same standard as the district court in deciding a motion to dismiss an obscenity charge. Under this standard of review, a determination regarding the constitutionality of an obscenity charge is a legal matter to be resolved by the courts. But even though both parties

(Continued)

## Analysis

¶11 The First Amendment's Free Speech Clause "prohibits any law 'abridging the freedom of speech.'"[5] This protection extends to preserve the right to express "[a]ll ideas having even the slightest redeeming social importance," including "unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion . . . unless excludable because they encroach upon the limited area of more important interests."[6] One important interest limiting First Amendment protection is society's interest in prohibiting obscenity. In other words, the First Amendment does not prohibit laws abridging obscene speech. So, under the First Amendment, a law may criminalize speech that is obscene.

¶12 Mr. Watts was found guilty by a jury of violation of Utah Code section 76-10-1206, which criminalizes the provision of "material harmful" to a minor. The statute includes within its definition of material "[h]armful to minors" representations or depictions of nudity.[7] Mr. Watts argues that the material at issue here, nude photographs, are not obscene and therefore protected by the First Amendment of the United States Constitution. He further argues that because the photographs were not obscene, his act of sending them constituted protected speech, and on this basis he appeals the district court's refusal to dismiss the charges against him.

---

agree that this is the appropriate standard of review, we note that the obscenity analysis requires the application of a community standard—a factor that complicates the question of whether the determination is legal or factual. It may be that jurors are better suited to determine community standards than a judge because jurors represent a more complete cross-section of the community. So the jury's superior position as a fact finder may warrant some deference on this issue, especially where the case comes to us after a jury verdict rather than a denial of a motion to dismiss. But, because our previous cases have treated an obscenity determination as a matter of law, and because neither party challenges that standard here, we examine the case under our traditional standard.

[5] *Butt v. State*, 2017 UT 33, ¶ 17, 398 P.3d 1024 (citation omitted).

[6] *Miller v. California*, 413 U.S. 15, 20 (1973) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

[7] UTAH CODE § 76-10-1201(5)(a).

¶13  In making this argument, Mr. Watts raises two issues. First, he argues categorically that nudity by itself cannot qualify as obscene. In his view, a material is not obscene, even for minors, unless it depicts "sexual conduct." We disagree. The United States Supreme Court has held and reaffirmed that sexual conduct is unnecessary in obscenity cases dealing with minors so long as the allegedly obscene material depicts sexually explicit or erotic nudity.[8] We therefore conclude that the inclusion of such nudity as material "harmful to minors" under section 76-10-1206 is constitutional.[9]

¶14 Second, Mr. Watts argues the district court erred in considering his sexually explicit chats as part of the obscenity analysis for the nude photographs. He contends the analysis should be limited to the photographs themselves. So, in other words, he claims that courts must confine their obscenity analysis to the content of the allegedly obscene material without considering the context in which those materials appear. Again, we disagree. The Supreme Court has repeatedly held that determining whether materials qualify as obscene requires looking to the context in which the materials are presented.

¶15  Third, Mr. Watts argues that Utah Code section 76-10-1206 is unconstitutional as applied to the photographs he sent. Because the *Miller* "sexual conduct" requirement does not apply to minors and context is appropriately considered in obscenity analysis, Mr. Watts's argument that the images he sent were not obscene fails. We affirm Mr. Watts's conviction.

I. Because the United States Supreme Court Has Held That Nudity May Be Obscene for Minors Depending on the Context, the Inclusion

---

[8] *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14, 213 n.10 (1975).

[9] *See* UTAH CODE § 76-10-1201 (defining material harmful to a minor). We note that Mr. Watts does not directly challenge section 76-10-1201. But because the statute criminalizes the distribution of nude materials to minors under certain circumstances and because Mr. Watts argues that the constitution protects all speech involving nudity—even for minors—this argument is best viewed as a constitutional challenge to the nudity element of the statute. But because Mr. Watts also makes arguments addressing the context and nature of the images at issue, we address these arguments as an as-applied challenge. *See infra* Section III.

of Nudity as Material "Harmful to Minors" Under Utah Code
76-10-1201 Is Constitutional

¶16 Mr. Watts argues that the district court should have dismissed the charge of dealing in material harmful to a minor under Utah Code section 76-10-1206 because under the First Amendment of the United States Constitution, nudity alone is not obscene, even for minors. But the United States Supreme Court has reaffirmed that explicit or erotic nudity by itself may be obscene for minors. So we uphold the inclusion of "nudity" in section 76-10-1201 as constitutional.

¶17 Utah Code section 76-10-1201(5)(a) defines "[h]armful to minors" as "that quality of any description or representation, in whatsoever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse when it:"(1) "taken as a whole, appeals to the prurient interest in sex of minors;" (2) "is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and" (3) "taken as a whole, does not have serious value for minors." "Serious value includes only serious literary, artistic, political or scientific value for minors."[10]

¶18 Mr. Watts asserts that nudity may not qualify as harmful—or obscene—because the United States Supreme Court's holding in *Miller v. California*, which limits obscenity to material containing "sexual conduct,"[11] applies not only to adults but to minors as well. But Mr. Watts misreads the Supreme Court's obscenity caselaw. *Miller* is an adult obscenity case. In *Ginsberg v. New York*, a case decided before *Miller*, the Court established that the First Amendment does not require the same obscenity standard for minors as it does for adults.[12] When the *Miller* Court inserted a "sexual conduct" requirement into the adult obscenity standard in *Miller*, it did not intend that requirement to apply to minors. This is confirmed by subsequent Supreme Court caselaw clarifying that material may be obscene for minors where it depicts sexually explicit or erotic nudity.[13]

---

[10] UTAH CODE § 76-10-1201(5)(b).

[11] 413 U.S. 15, 24 (1973).

[12] 390 U.S. 629, 638–40 (1968).

[13] *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14, 213 n.10 (1975).

¶19 The Supreme Court's obscenity jurisprudence presents a somewhat "tortured history."[14] For decades, the Court struggled to articulate quantifiable standards under which allegedly obscene material could be analyzed, leading some to conclude the Court may be trying to "define what may be indefinable."[15]

¶20 One of the Supreme Court's first attempts at defining obscenity occurred in *Roth v. United States*.[16] In that opinion, the Court explained that "[a]ll ideas having even the slightest redeeming social importance" are entitled to First Amendment protection.[17] But the Court also noted that "implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance."[18] So, according to the *Roth* Court, obscene material lacked social value and was, therefore, not protected by the First Amendment.

¶21 To determine whether material qualified as obscene, the *Roth* Court discussed various obscenity tests used by other courts. Summarizing these tests, the Court explained that, in making an obscenity determination, courts typically "appl[ied] contemporary community standards" to determine whether "the dominant theme of the material taken as a whole appeals to prurient interest."[19] Based on the principles identified in this discussion, the Court upheld the constitutionality of the statute at issue.

¶22 Following this decision, the Court relied on the principles identified in the *Roth* case to develop a three-element test.[20] Under this test, material is obscene if "(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the

---

[14] *Butt v. State*, 2017 UT 33, ¶ 16, 398 P.3d 1024 (quoting *Miller*, 413 U.S. at 20).

[15] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[16] 354 U.S. 476 (1957).

[17] *Id.* at 484.

[18] *Id.*

[19] *Id.* at 489.

[20] *Miller*, 413 U.S. at 21 ("[U]nder the *Roth* definition 'as elaborated in subsequent cases, three elements must coalesce . . . .'" (quoting *Memoirs v. Massachusetts*, 383 U.S. 413, 418 (1966) (plurality opinion)).

material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."[21]

¶23  About ten years after *Roth* was decided, in *Ginsberg v. New York*, the Court considered the constitutionality of a New York obscenity statute that defined material to be obscene to minors "on the basis of its appeal to [minors] whether or not it would be obscene to adults."[22] In other words, the Court had to determine whether material that did not qualify as obscene under the *Roth* obscenity test for adults could nevertheless be considered obscene when presented to minors. The Court held that it could.[23]

¶24  In *Ginsberg*, the allegedly obscene material consisted of nude female images inside "'girlie' picture magazines."[24] Although the Court noted that the images at issue—which depicted either "female buttocks with less than a full opaque covering" or a "female breast with less than a fully opaque covering of any portion thereof below the top of the nipple"—were "not obscene for adults,"[25] it held that New York could criminalize the distribution of nude images to minors.[26]

¶25  In so holding, the Court relied on the state's constitutionally recognized interest in protecting children. Specifically, the Court noted that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults."[27] So the Court's decision in *Ginsberg* demonstrated that a broader obscenity standard may be applied where a state's interest in protecting minors is implicated. And, under this broader standard, the Court affirmed that nude images may be considered obscene for minors even though they would not be considered obscene under the *Roth* obscenity standard for adults.

---

[21] *Memoirs*, 383 U.S. at 418.

[22] 390 U.S. at 631.

[23] *Id.* at 637.

[24] *Id.* at 634.

[25] *Id.* at 632–34.

[26] *Id.* at 636–37.

[27] *Id.* at 638.

¶26 Five years after the Court decided *Ginsberg*, in *Miller v. California*, the Court reevaluated the adult obscenity standard it had established in *Roth*. In *Miller*, the Court considered whether "pictures and drawings very explicitly depicting men and women in groups of two or more engaging in a variety of sexual activities, with genitals often prominently displayed," could be considered obscene.[28] In deciding this issue, the Court sought "to formulate standards more concrete than" the standard it had established in *Roth*.[29]

¶27 Because the Court recognized that the *Roth* test was unworkable in practice, and because of "the inherent dangers of undertaking to regulate any form of expression," the Court confined the permissible scope of obscenity "to works which depict or describe sexual conduct."[30] The Court then incorporated this limitation into a modified version of the *Roth* test.[31]

¶28 Mr. Watts relies on this aspect of the *Miller* decision to argue that the nude images he sent fall within the First Amendment's protection. In Mr. Watts's view, because material is not obscene under the modified *Miller* standard unless it depicts sexual conduct, the nude images he sent are not obscene.[32] But *Miller* was an adult obscenity case. And its inclusion of a "sexual conduct" requirement does not impose the same requirement on materials for minors. This is clear from the text of the *Miller* opinion, subsequent Supreme Court caselaw, and the policies the Court identified in *Ginsberg*.

---

[28] 413 U.S. at 18.

[29] *Id.* at 20. This was necessary, according to the Court in *Miller*, because subsequent cases had "drastically altered [the *Roth*] test" even as they "repeated the words of *Roth*." *Id.* at 22.

[30] *Id.* at 23–24.

[31] So, under the Court's decision in *Miller*, material is obscene where (1) "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (2) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24 (citation omitted) (internal quotation marks omitted).

[32] As we noted above, we need not determine in this case whether the nude images Mr. Watts sent depict "sexual conduct."

¶29 For example, not only did the facts of *Miller* implicate just the adult obscenity standard, but in the course of the opinion, the Court reaffirmed the *Ginsberg* holding. At several places throughout the opinion, the Court cited *Ginsberg* favorably.[33] And in a concluding footnote, the Court reiterated that, "because of its strong and abiding interest in youth," a state could regulate "the dissemination" of materials to minors even when the state "clearly could not regulate [the same materials] as to adults."[34] So the Court's decision in *Miller* makes clear that different laws may be applied by states to material disseminated to children. And subsequent caselaw confirms that nudity may still be considered obscene for minors.

¶30 Shortly after the *Miller* case was decided, the Court reaffirmed that nudity may be obscene for minors in *Erznoznik v. City of Jacksonville*.[35] In *Erznoznik*, the Court considered the constitutionality of a city ordinance criminalizing the showing of nudity at drive-in movie theaters, in part, to protect minors.[36] Significantly, the ordinance at issue defined the criminal conduct broadly so that it encompassed "any nudity, however innocent or even educational."[37] Based on the ordinance's broad definition of criminal nudity, the Court noted that the ordinance was not specifically directed at "sexually explicit nudity."[38] Rather, the ordinance's definition of criminal nudity was broad enough to "bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous."[39] Because these instances of nudity could not "be deemed obscene even as to minors," the Court ruled the ordinance was unconstitutionally overbroad.[40]

¶31 But even though the Court ultimately struck down the ordinance, it nevertheless indicated that the *Miller* "sexual conduct"

---

[33] *See, e.g., id.* at 19, 27.

[34] *Id.* at 36 n.17 (citation omitted).

[35] 422 U.S. 205 (1975).

[36] *Id.* at 206, 212. The movie at issue depicted "female buttocks and bare breasts." *Id.* at 206.

[37] *Id.* at 211.

[38] *Id.* at 213.

[39] *Id.*

[40] *Id.* at 213–14.

requirement did not apply to the obscenity analysis for minors. It did this in two ways. First, it noted that "[i]t is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults."[41] And second, it distinguished between "sexually explicit [or erotic] nudity" and "innocent or even educational" nudity without any reference to a "sexual *conduct*" requirement.[42] The Court even went so far as to expressly note that while it had "not had occasion to decide what effect *Miller* will have on the *Ginsberg* formulation," it was clear that the minimum constitutional protection offered under a child obscenity standard is not the same as the minimum constitutional protection under the adult standard.[43] To that point, the *Erznoznik* Court clarified that nudity may be obscene as to minors if it is "in some significant way, 'erotic.'"[44]

¶32 Accordingly, the incorporation of a sexual conduct requirement into the obscenity standard for minors would be inconsistent with principles articulated in the Supreme Court's obscenity caselaw. As we have noted, in *Ginsberg*, the Court upheld the conviction of a shop owner who sold magazines containing nudity to a minor. In so doing, it acknowledged the magazines were not obscene for adults. But it recognized the need to protect children from exposure to harmful materials.[45] The Court noted that parents and others who hold the primary responsibility for minors' well-being "are entitled to the support of laws designed to aid discharge of that responsibility."[46] The Court also recognized that the state has an independent interest "to protect the welfare of children and to see that they are safeguarded from abuses which might prevent their growth into free and independent well-developed . . . citizens."[47]

¶33 In passing Utah Code section 76-10-1206, the legislature sought to safeguard the state and parental interests in protecting the welfare of children. In so doing, it included no "sexual conduct"

---

[41] *Id.* at 212 (citing *Ginsberg*, 390 U.S. 629).

[42] *Id.* at 211, 213.

[43] *Id.* at 212, 213 n.10.

[44] *Id.* (citation omitted).

[45] *Ginsberg*, 390 U.S. at 639.

[46] *Id.*

[47] *Id.* at 640–41 (citation omitted) (internal quotation marks omitted).

requirement. Under *Ginsberg*, as reaffirmed by *Erznoznik*, the legislature was constitutionally permitted to define obscenity for minors in this way. Accordingly, what is not obscene for adults may still be obscene for minors. Sexual conduct need not be required in a statute defining obscenity for minors. Nudity alone may qualify as obscenity for minors, provided it is "sexually explicit" or "erotic."[48] Because the Supreme Court has held that nudity alone may be obscene for minors, we hold that section 76-10-1206 is constitutional.

## II. The Obscene Nature of Material Depends on the Context in Which It Is Presented

¶34  Next, we turn to Mr. Watts's argument that the district court erred in basing its obscenity conclusion on contextual evidence. Below, the district court found that the images "did not depict sex." But the court nevertheless concluded that the images were sexual in nature because the conversation surrounding the distribution of the images described sexual acts. Mr. Watts argues this was error because, under the governing standard, images can be considered obscene only where "the content of the images themselves" is obscene. In other words, Mr. Watts asserts that courts cannot consider a material's context as part of its obscenity analysis. We disagree.[49]

¶35 The United States Supreme Court has long held that whether material is obscene depends on the context in which it is presented.[50] For example, in *Roth v. United States*, the Court

---

[48] *See Erznoznik*, 422 U.S. at 213 & n.10 (citation omitted).

[49] We note that Mr. Watts builds this argument, in part, on the assumption that the *Miller* "sexual conduct" requirement applies to obscenity cases involving minors. For example, he argues that the use of contextual evidence would impermissibly "imbue an otherwise conductless image with content." As we explain above, Mr. Watts's assumption about the "sexual conduct" requirement is incorrect. Accordingly, we address Mr. Watts's context-related argument only to the extent it does not rely on his assumption that a finding of sexual conduct is required.

[50] We note that the obscenity standard in *Roth*, the statute approved of in *Ginsberg*, and the *Miller* criteria all use the "taken as a whole" language. Because this language remains consistent throughout the line of cases and because there is a lack of cases involving minors specifically, we look to the full body of the Court's obscenity caselaw interpreting this language.

described the obscenity test as "whether to the average person, applying contemporary community standards, the dominant theme of the material *taken as a whole* appeals to prurient interest."[51] And in *Miller v. California*, the Court stated that the "First Amendment protects works which, *taken as a whole*, have serious literary, artistic, political, or scientific value."[52] For this reason, the *Miller* Court explained that an obscenity analysis must be directed at identifying "works which, taken as a whole, appeal to the prurient interest in sex . . . and which, taken as a whole, do not have serious literary, artistic, political, or scientific value."[53] So, under Supreme Court caselaw, an obscenity analysis must focus on the work "taken as a whole."[54]

¶36 Although Mr. Watts does not dispute that, as part of an obscenity analysis, courts must consider the work as a whole, he claims that the relevant "work" in this case should be limited to the nude images he sent. In other words, the relevant "work" does not include the sexually explicit messages that accompanied those images. But we do not read the "taken as a whole" language so narrowly. Rather, we construe it as an instruction to consider the relevant contextual evidence.

¶37 This is clear from the Supreme Court caselaw introducing the "taken as a whole" language. For example, in *Roth*, the Court warned against making an obscenity determination based on an "isolated excerpt" of the material.[55] And in *Kois v. Wisconsin*,[56] the Court quoted the "taken as a whole" language before explaining that this analysis, "of necessity," required courts to "look at the context of the material, as well as its content."[57]

¶38 In *Kois*, the Court considered whether a small image depicting a nude man and woman embracing in a seated position

---

[51] 354 U.S. 476, 489 (1957) (emphasis added).

[52] 413 U.S. 15, 34 (1973) (emphasis added).

[53] *Id.* at 24.

[54] We also note that the Utah criminal code has adopted the "taken as a whole" language into its obscenity analysis. *See* UTAH CODE § 76-10-1201(5)(a).

[55] *Roth*, 354 U.S. at 488–89.

[56] 408 U.S. 229, 230-31 (1972) (per curiam).

[57] *Id.*

and a poem describing sex were obscene.[58] As part of its analysis, the Court noted that the image appeared as part of a newspaper article discussing the state's enforcement of an obscenity law.[59] Because the images were "similar to the [image] seized" in the state obscenity action discussed in the article, and because "in the context in which they appeared in the newspaper they were rationally related to an article that itself was clearly entitled to [First Amendment protection]," the Court determined that the images were not obscene.[60]

¶39 Similarly, in analyzing the obscene nature of the poem, the Court noted that the poem describing sex appeared in the newspaper's "two-page spread consisting of 11 poems."[61] Based on "the poem's content and its placement amid a selection of poems in the interior of a newspaper," the Court felt that the poem bore "some of the earmarks of an attempt at serious art."[62] And for this reason, the Court concluded that "the dominant theme of [the] poem" did not appeal to a prurient interest in sex.[63] So, as the Supreme Court's opinion in *Kois* demonstrates, a proper obscenity analysis necessarily requires courts to consider the context in which the allegedly obscene material appears.

¶40 We recently followed the Supreme Court's example, in *Butt v. State*,[64] by considering the context in which allegedly obscene material appeared. In that case, a father sent two crudely drawn, nude pictures of himself to his five-year-old daughter.[65] In the second drawing, the father drew himself holding his daughter up in the air.[66] In determining whether these pictures were obscene, we considered testimony from the father as to why he sent the drawings.[67] In so doing, we acknowledged that, because "not all

---

[58] *Id.* at 230.

[59] *Id.* at 230–31.

[60] *Id.* at 231.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 232.

[64] 2017 UT 33, 387 P.3d 1024.

[65] *Id.* ¶ 4.

[66] It was unclear if the daughter was naked.

[67] *Id.* ¶¶ 34, 36.

nudity has sexual appeal," we had to consider "the character of the material in the context in which it is presented."[68] Because we accepted the undisputed testimony of the father that the images were replicas of cave drawings from a documentary the two had watched together, we concluded that the pictures were not obscene.[69] So our decision in *Butt* is consistent with the Supreme Court's practice of considering relevant contextual evidence as part of an obscenity analysis.

¶41 Mr. Watts does not dispute that we, and the United States Supreme Court, have considered contextual evidence in the past. Instead, he argues that the Supreme Court's decision in *Kois* is distinguishable because, in that case, the relevant "work" was the entire newspaper, not just the nude image or the poem describing sex. But this argument misconstrues the reasoning in the *Kois* opinion. As part of its decision in *Kois*, the Court clearly identified the relevant "work" as the allegedly obscene poem, not the entire newspaper issue in which the poem appeared.[70] So by considering the poem in the context of the other poems in the newspaper, the Court's analysis included contextual evidence beyond the allegedly obscene material.

¶42 And even were we to accept Mr. Watts's framing of the relevant "work" in *Kois*, we do not believe this framing supports his position. As we noted above, Mr. Watts asserts that the relevant work in *Kois* was the entire newspaper in which the allegedly obscene material appeared. But we do not see a significant distinction between a newspaper containing allegedly obscene materials and Mr. Watts's online chat containing nude images and explicit sexual communications.[71] In other words, we see no significant distinction between the *Kois* Court's consideration of

---

[68] *Id.* ¶ 24.

[69] *Id.* ¶ 36.

[70] *Kois*, 408 U.S. at 232 (analyzing the "dominant theme" of the allegedly obscene "poem," rather than the dominant theme of the newspaper issue).

[71] When *Kois* was decided, the internet—and, consequently, online chats—were not publicly available. And since that time the Supreme Court has not updated the obscenity criteria to reflect changing technology. But, in absence of this needed update, we conclude that the analog communication of the time may be analogized to the digital communication of the present day.

newspaper articles adjacent to the allegedly obscene materials and our consideration of the explicit sexual messages Mr. Watts sent together with the nude images at issue. So Mr. Watts's attempt to distinguish the Court's decision in *Kois* from this case on the basis of the scope of the relevant work fails.

¶43 Alternatively, Mr. Watts argues that the decisions in *Kois* and *Butt* are distinguishable because, in those cases, the courts relied on contextual evidence to conclude that the material at issue was not obscene. In other words, he asserts that contextual evidence can be used only to shield a criminal defendant from an obscenity finding— it cannot be used by the prosecution as evidence that material is obscene. This argument also fails.

¶44 Although we acknowledge that in many obscenity cases contextual evidence has aided defendants, Mr. Watts cites no authority to suggest that contextual evidence must be ignored where it would be prejudicial to the defendant's case. To the contrary, governing precedent indicates that contextual evidence must be considered to properly ascertain the character of disputed material. So even though contextual evidence may benefit defendants in certain cases, the purpose of considering contextual evidence is to aid the court in making an accurate obscenity analysis.[72]

¶45 In sum, we conclude that the Supreme Court's instruction to consider the relevant "work as a whole" while conducting an obscenity analysis requires courts to consider relevant evidence. This includes the content of the allegedly obscene material as well as the context in which that work appears. Accordingly, in this case, the district court did not err in considering the sexually explicit messages as part of its analysis regarding the obscene nature of the nude images Mr. Watts sent.

### III. Utah Code Section 76-10-1206 Is Constitutional as Applied to Mr. Watts

¶46 Mr. Watts argues that Utah Code section 76-10-1206 is unconstitutional as applied to the photographs he sent. In making

---

[72] Although, in *Ginsberg*, the Court did not discuss the importance of considering contextual evidence, its reasoning suggests that the Court's obscenity determination was based on the fact that the nude images appeared in a "'girlie' picture magazine[]." *See Ginsberg v. New York*, 390 U.S. 629, 634 (1968); *see also id.* at 672 (Fortas, J., dissenting) (describing the "girlie" magazine as a "vulgar," "tasteless," and "tawdry" periodical).

this argument, Mr. Watts claims that his conviction should be reversed because none of the three *Miller* elements, even if modified for minors, are satisfied in this case. But having determined that *Miller*'s sexual conduct requirement does not apply to minors, and the district court properly considered the text messages surrounding the nude photographs, Mr. Watts's remaining arguments fail.

¶47 It is true that the Supreme Court has "stopped short of establishing a standard for material directed to minors."[73] However, the Court has given us enough guidance to address the only arguments presented by Mr. Watts. Mr. Watts's challenge to the constitutionality of his conviction, framed in terms of the *Miller* standard, boils down to three arguments: (1) the images he sent do not appeal to a thirteen-year-old's prurient interest in sex; (2) "[t]he material does not portray sexual conduct in a way that is offensive, even to a thirteen-year-old"; and (3) the photographs were not obscene because they had serious artistic value. Applying Supreme Court precedent, these arguments fail.

¶48 First, Mr. Watts argues that the images he sent do not appeal to a prurient interest in sex for a thirteen-year-old girl. Because the district court properly considered the context in which Mr. Watts sent the photographs, under *Kois v. Wisconsin*,[74] the images at issue in this case easily satisfy this requirement. "A prurient interest in sex is one that is [] shameful or morbid.'"[75] We applied this element in *Butt v. State* without resolving the differences between the obscenity standards in *Ginsberg v. New York* and *Miller v. California* because the element went unchanged from *Roth* to *Miller*.[76] We noted in *Butt* that material aimed at appealing to the interest in illegal sex is easily deemed "shameful or morbid."[77] The district court concluded that this requirement was met because the photographs and conversation "all came up in the context of [a] highly sexualized conversation where [Mr. Watts] is alleged to have been soliciting sex and trying to

---

[73] *Infra* ¶ 53 (Lee, A.C.J., concurring in the judgment).

[74] 408 U.S. 229 (1972) (per curiam).

[75] *Butt v. State*, 2017 UT 33, ¶ 32, 398 P.3d 1024 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

[76] *Id.* ¶ 21 ("Fortunately, *Roth* and *Miller* identify roughly equivalent standards on the question presented here. Both require that 'the material taken as a whole appeal to a prurient interest in sex.'" (citations omitted)).

[77] *Id.* ¶ 32.

set up a sexual encounter with a minor child." The evidence in this case confirms that the photographs were explicitly aimed at enticing a thirteen-year-old girl to have sex with an adult man and possibly an adult woman. This satisfies the prurient interest requirement.

¶49 Second, Mr. Watts argues his conviction was unconstitutional because the images "do[] not portray sexual conduct in a way that is offensive, even to a thirteen-year-old." But as we have explained, the Supreme Court has held that material may be considered obscene for minors—even where it does not depict sexual conduct—if it depicts "sexually explicit" or "erotic" nudity.[78] And the nudity at issue here, considered in the context of the surrounding text messages, was sexually explicit and erotic. Further, we have no trouble concluding that any adult in the community would find it patently offensive for an adult man to send a thirteen-year-old girl multiple photographs of women posed with breasts exposed, especially when those photographs are accompanied by a request that the young girl identify which one of the women had breasts most like hers and a promise to try and get one of the nude women from the photographs to join the two of them in sex. In context, it is clear that Mr. Watts sent these nude images to titillate: he encouraged the girl to view pornography and to google "girls masturbate videos." He also asked her if she wanted to "see some big" breasts along with a number of other explicit and "sexually charged" statements. With this context in mind, we conclude that the district court did not err in its determination that the nude images are patently offensive and unsuitable for a thirteen-year-old.

¶50 Mr. Watts's final argument is that, taken as a whole, the material has serious value for minors. Specifically, Mr. Watts claims the photographs had serious artistic value. But as the district court noted, the images were not sent as part of a discussion about "Renaissance [a]rt or physiology or anything that might appeal to artistic or scientific value otherwise." It cannot be seriously argued that there is any value for minors in nude photographs of adult females (who are posed in sexually suggestive ways), which are distributed for the purpose of grooming a thirteen-year-old to have sex with an adult man.

---

[78] *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 & n.10 (1975) (citation omitted).

¶51 Because Mr. Watts's three arguments that the statute was unconstitutional as applied to his conduct fail, we affirm his conviction.

## Conclusion

¶52 The United States Supreme Court held in *Ginsberg v. New York* and again in *Erznoznik v. City of Jacksonville* that nudity may be unprotected speech for minors depending on the context: Sexual conduct is not required in the obscenity analysis for minors. We affirm the district court's holding that the relevant context may be constitutionally considered in the obscenity analysis and that the nude photographs Mr. Watts sent, when viewed in context of his sexually explicit messages, are unprotected obscene speech for minors. Accordingly, we affirm Mr. Watts's conviction.

---

ASSOCIATE CHIEF JUSTICE LEE, concurring in the judgment:

¶53 Joseph Watts contends that the State infringed his constitutionally protected free speech rights in pursuing a criminal charge arising out of sexually explicit interactions with a minor online. Watts relies on a line of free speech cases handed down by the United States Supreme Court many decades ago—principally, the three-part test for obscenity prescribed in *Miller v. California*, 413 U.S. 15 (1973). Yet the *Miller* opinion sets an obscenity standard for material provided to adults. And the Court has studiously stopped short of establishing a standard for material directed to minors. *See Ginsberg v. New York*, 390 U.S. 629, 631 n.1, 636–37 (1968) (declining to define the precise scope of First Amendment protection for material directed to minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–14 & n.10 (1975) (stating that "adult obscenity standards" do not govern "obscenity as to minors" and noting that the Court had "not had occasion" to decide how *Miller* would affect the standard for material directed to minors).

¶54 Watts asks us to hold that the "material" he directed to a minor is protected speech under "the correct test" of obscenity under the First Amendment. He contends that the district court "applied the incorrect test" in "compress[ing]" the three elements of the *Miller* test "into one prong" and "then replac[ing] the content of the images themselves with context unrelated to whether the material was obscene." And he asks us to uphold a First Amendment right to distribute the images at issue to a minor under a standard rooted in *Miller* but with a "modification" based on *Ginsberg*—on the grounds that the images he sent "do not appeal to a prurient interest in sex for" a minor, "do not depict sexual conduct in a patently offensive way," and are "not without societal value."[79]

---

[79] In his opening brief, Watts asserted that "[t]his Court should conclude that the district court applied the wrong standard and should apply the *Miller* test to *the images in this case*, including the *Ginsberg* modification to minors for prong 1." (Emphasis added.) He also claimed that the images he distributed "are not obscene and therefore are protected by the First Amendment." The State responded by suggesting that Watts had asserted only a "facial challenge" to the constitutionality of the Utah statute. On reply, Watts reiterated that he is asserting that "*his conduct* is protected by the constitution, regardless of what the statute purports to criminalize." (Emphasis added.)

LEE, A.C.J., concurring in the judgment

¶55 The majority affirms the denial of Watts's motion to dismiss but stops short of identifying a legal basis for a governing constitutional standard. Instead of so doing, the majority limits its analysis to the rejection of two elements of Watts's position on the governing First Amendment standard of obscenity for material directed to minors. First, it holds that "incorporation of a sexual conduct requirement into the obscenity standard for minors" is "inconsistent" with Supreme Court precedent. *Supra* ¶ 32. Second, it interprets the governing case law to allow consideration of the "context" in which an image is distributed "as part of [the] obscenity analysis." *Supra* ¶ 34.

¶56 These threshold conclusions may be premised on a correct reading of Supreme Court case law. But this analysis leaves unanswered the question whether Watts's acts are protected activity under the First Amendment.

¶57 I would resolve that question on the ground that Watts has failed to carry the burden of persuasion he bears in establishing a basis for his constitutional claim. I would hold that Watts has not identified a basis for a standard of obscenity for material directed to minors in either controlling Supreme Court precedent or in the original meaning of the First Amendment. And I would affirm the denial of his motion to dismiss on that ground.

I

¶58 Our laws are entitled to a "strong presumption of constitutionality." *Maxfield v. Herbert*, 2012 UT 44, ¶ 15, 284 P.3d 647 (citation and internal quotation marks omitted). The presumption is of course rebuttable. But a party that asserts a constitutional claim bears the burden of persuasion—in identifying a basis for a governing constitutional standard, and demonstrating that the standard is not met as applied in a given case. *See Neese v. Utah Bd. Pardons & Parole*, 2017 UT 89, ¶ 164 n.47, 416 P.3d 663 (Lee, A.C.J., dissenting) (stating that "[t]he burden of establishing the unconstitutionality" of a law falls on the party raising the claim and concluding that the burden had not been met where the party had failed to identify a basis for its proposed disposition in the original understanding of the Constitution).

¶59 A party may carry the burden of establishing a controlling constitutional standard by identifying a basis for it in governing precedent or in the original meaning of the text of the Constitution. *Steiner v. Utah State Tax Comm'n*, 2019 UT 47, ¶ 63, 449 P.3d 189 (rejecting a constitutional claim when the party could not anchor its claim in "text, history, or precedent"). Where the standard is set forth

LEE, A.C.J., concurring in the judgment

in controlling precedent from the United States Supreme Court, we are of course bound to follow it. But there is no controlling precedent on the ultimate question presented in this case—on the free speech standard of obscenity for material provided by an adult to a minor. That leaves Watts with the burden of identifying some other basis for the controlling standard. And I would hold that he has failed to carry the burden.

II

¶60  Watts has asked us to pick up where the U.S. Supreme Court left off many decades ago—in revising and adapting a free speech standard that lacks any express connection to the text or original meaning of the First Amendment to the constitution, and is rooted instead in an open attempt at common-law policymaking. I see no basis for so doing.

¶61 Our recent case law has emphasized the difficulties that lower courts face when we are asked to revise and extend U.S. Supreme Court precedent of the sort presented here. *See Steiner v. Utah State Tax Comm'n*, 2019 UT 47, ¶¶ 62–64, 449 P.3d 189; *DIRECTV v. Utah State Tax Comm'n*, 2015 UT 93, ¶¶ 45–46, 364 P.3d 1036. *Steiner* and *DIRECTV* involved constitutional challenges to state law under the so-called Dormant Commerce Clause of the U.S. Constitution. In that field, we lamented that "the high court's rulings" had "proceeded on an *ad hoc* basis lacking any 'clear, overarching theory'" or "mooring" in the original meaning of the text of the Constitution. *Steiner*, 2019 UT 47, ¶¶ 3, 18 (citation omitted). We acknowledged "our duty to follow controlling precedent." *Id.* ¶ 3. But we also "emphasized the difficulty of 'anticipat[ing] expansions of the law'" in a field lacking a clear basis in theory or in the constitutional text. *Id.* (alteration in original) (citation omitted). "And in the absence of clear direction (in text, history, or precedent), we declined to make a guess about the direction the case law might take in the next case that comes before the Supreme Court." *Id.* (citation omitted). We did so "not out of any disrespect for the United States Supreme Court, but in our best attempt at judicial humility in a constitutional field marked more by haphazard policy judgments than any unifying legal theory." *Id.* ¶ 20.

¶62 "In such a field," we concluded that "it would seem presumptuous to make our own guess about the next move the high court might make as it extends its precedent." *Id.* And in a case in which the party asserting a constitutional claim had identified no basis for its position in the original meaning of the Constitution, *id.* ¶ 64, and the U.S. Supreme Court itself had likened its case law to

a "quagmire," *id.* ¶ 16, we "le[ft] it to that court to mark the next extension in this field," *id.* ¶ 20.

¶63 The case before us today presents a similar set of problems. The free speech standards set forth in *Miller* lack any overt "mooring" in the text or original meaning of the Constitution. This is "*ad hoc*" policymaking "lacking a clear basis in theory or in the constitutional text." And it is every bit the "quagmire" presented in the dormant commerce sphere. *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) (suggesting that the Court might "never succeed in intelligibly" stating a governing standard of obscenity, and concluding only that "I know it when I see it, and the motion picture involved in this case is not that").

¶64 The *Miller* standard takes a legal form. It is presented as a three-part test. *Miller v. California*, 413 U.S. 15, 24 (1975). But the test is nowhere connected to a "clear, overarching theory," much less to the text or original understanding of the First Amendment. And the three parts of the test leave key questions unanswered, reserving "I know it when I see it" discretion for juries and judges in applying the test, and defying courts to make a "guess about the next move the high court might make" when it "extends its precedent" into new spheres. *Steiner*, 2019 UT 47, ¶ 20.

¶65 Watts has invited us to make a range of guesses about how *Miller* might be adapted to fit the context of material aimed at minors. He implicitly acknowledges some important, unresolved questions under *Miller*—as to (a) how to define the scope of the relevant "work";[80] (b) what elements of a work's context should be considered in assessing whether, "taken as a whole," it appeals to the "prurient interest in sex" or has "serious literary, artistic, political, or

---

[80] *See City of St. George v. Turner*, 860 P.2d 929, 931, 934 (Utah 1993) (considering a First Amendment challenge raised by music shop owner who pinned bed sheets to the walls and allowed patrons to spray paint them—which they did with a range of potentially offensive phrases and images; holding that "it is problematic to dignify the bed sheets by calling them a 'work'"); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1370 (5th Cir. 1980) (stating that "a magazine usually is not as thematically integrated as a book or a movie" but is "more so than a newspaper"); *City of Urbana ex rel. Newlin v. Downing*, 539 N.E.2d 140, 148 (Ohio 1989) (suggesting that a "magazine must be looked at as a whole and not as a series of 'works' resulting in a 'volume'" (citation omitted)).

scientific value";[81] (c) whether a jury's determination under these standards merits deference by a reviewing trial judge or appellate court;[82] and (d) whether the appellate standard of review is dictated by federal or state law.[83] And he asks us to adopt a revised *Miller* test

---

[81] *See Turner*, 860 P.2d at 931, 934 (noting the lack of any "discernible unifying theme or organizational structure to the drawings and statements" on bed sheets hung from walls on a music shop; stating that there are "two isolated sexual images" that were "rendered by different individuals who were venting whatever thoughts, however base, crude, or unconventional, that came into their minds"; and concluding that the "isolated sexual images do not make the four bed sheets plainly and unmistakably sexual in nature"); *City of Cincinnati v. Contemp. Arts Ctr.*, 566 N.E.2d 214, 217 (Ohio Mun. Ct. 1990) (noting that "the meaning of the phrase 'taken as a whole'" has not been established by the Supreme Court; concluding that a photograph in an art gallery, unlike a newspaper or poem, "stands alone within the four corners of its framework").

[82] *See Miller v. California*, 413 U.S. 15, 24 (1973) (characterizing the three parts of the test as articulating "guidelines for the trier of fact"); *id.* at 26 ("In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide"); *Pope v. Illinois,* 481 U.S. 497, 500 (1987) (treating "the first and second prongs of the *Miller* test" as "issues of fact for the jury"); *Smith v. United States*, 431 U.S. 291, 304–06 (1977) (stating that the reference to "contemporary community standards" "does not mean" that obscenity determinations "will be virtually unreviewable"; emphasizing that "[t]he type of conduct depicted must fall within the substantive limitations suggested in *Miller*" and holding that "it is always appropriate for the appellate court to review the sufficiency of the evidence" (citation omitted)); *United States v. Various Articles of Obscene Merch., Schedule No. 2102*, 709 F.2d 132, 136 (2d Cir. 1983) (suggesting that "appellate courts are required to exercise *de novo* review as to the preliminary substantive requirement[s]" of *Miller*, and "the trier's finding that the material is non-obscene is virtually shielded from appellate scrutiny, at least absent evidence that it is so clearly unreasonable as to amount to abuse of discretion").

[83] *See Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶¶ 9, 14, 345 P.3d 1253 (noting that state law standards of appellate review of lower court determinations of mixed questions of law and fact are based on "an institutional policy determination" by the court; stating

(Continued)

that accounts for some of the unique policy concerns that arise when erotic material is aimed at minors, and that credits those concerns as more weighty than the government's interests in prosecuting the crimes charged in a case like this one. Watts's position, however, finds no support in controlling precedent.

¶66 There is no precedent establishing a controlling standard of obscenity for material directed to minors. The policy-based formulation in *Miller* has been on the books for almost fifty years. Yet the Court has never established a standard of obscenity as to minors, *see supra* ¶ 53, and the indeterminacies in the *Miller* formulation have largely been left to fester.

¶67 The Supreme Court acknowledged this problem just two years after the *Miller* standard was first handed down. In *Erznoznik v. City of Jacksonville*, the Court stated that "adult obscenity standards" do not govern "obscenity as to minors." 422 U.S. 205, 213 n.10 (1975). It also noted apologetically that the Court had "not had occasion to decide what effect *Miller* will have" in this setting. *Id.*

¶68 We are still awaiting such occasion. All we have is the vague notion in *Erznoznik* that "not all nudity" may be "proscribed," and

---

that we review mixed determinations—which may encompass the various inquiries under *Miller*—under a level of deference "[d]epending on the nature of the legal question at issue," with some "mixed questions with constitutional dimensions" being reviewed "de novo for policy reasons"); *Hanna v. Plumer*, 380 U.S. 460, 471–72 (1965) (holding that "neither Congress nor the federal courts can, under the guise of formulating rules of decision for federal courts, fashion rules" governing state courts "which are not supported by a grant of federal authority contained in Article I or some other section of the Constitution"; stating that "in such areas state law must govern because there can be no other law"); *Turner*, 860 P.2d at 932–33 (acknowledging that "judges possess no special expertise that qualifies them to supervise the private morals of the nation or to decide whether a particular speech or communication is good or bad for a local community," but holding that "judges are better equipped by their training to appreciate and protect First Amendment values"; quoting plurality opinion in *Jacobellis v. Ohio*, 378 U.S. 184, 188 n.3 (1964), for the proposition that there is "no group" other than appellate judges that are "better qualified" to make "value judgments of the type required by the constitutional standards for obscenity").

that "to be obscene, 'such expression must be, in some significant way, erotic.'" *Id.* (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

¶69 This leaves lower courts "largely in the dark" on how to resolve the questions presented in a case like this one. *See Steiner*, 2019 UT 47, ¶ 17 (raising a parallel concern as to dormant commerce case law). There is no "clear, overarching theory" driving the Supreme Court's standards of obscenity. *See DIRECTV*, 2015 UT 93, ¶ 45 (making that point regarding dormant commerce case law). *Miller* is a matter of "*ad hoc*" weighing of policy considerations. *Cf. Steiner*, 2019 UT 47, ¶ 17–19.

III

¶70 Our 2021 understanding of the policy questions presented in obscenity cases is surely different from that which informed the *Miller* formulation in 1973. *Miller v. California*, 413 U.S. 15 (1973). *Miller* was decided decades before the advent of the internet. And the digital world of today introduces a range of difficulties for anyone seeking to extend or refine *Miller* in the context of material directed to minors. Among other things, the internet has made it easier for pedophiles to groom children for sexual abuse—by providing a seemingly anonymous platform for predators to encounter children, engage them in sexually explicit conversations, and groom them for abuse or other forms of lasting harm. *See* Helen C. Whittle, Catherine Hamilton-Giachritsis, & Anthony R. Beech, *Victims' Voices: The Impact of Online Grooming and Sexual Abuse*, 1 UNIVERSAL. J. PSYCHOLOGY 59, 62–67 (2013) (documenting stories of children who experienced online sexual abuse, which sometimes led to offline sexual abuse, and detailing impacts of online sexual abuse and noting that "online-only" abuse did not differ in "extent of the impact on the victim" from offline sexual abuse).

¶71 A legislative body may be in a position to account for these and other policy considerations in establishing a standard of obscenity for material directed to minors. Someday, perhaps the Supreme Court will take up that task. But I see no basis for this court to apply the standard proposed by Watts on the briefing presented to us in this case.

¶72 Because Watts has failed to carry the burden of establishing a basis for a constitutional standard that works in his favor, I would end the analysis of Watts's as-applied challenge there. I would affirm on the ground that Watts has fallen short of identifying a basis for his position in the text or original meaning of the First Amendment or controlling Supreme Court precedent.